TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00626-CR

NO. 03-07-00627-CR






Laura Ashley Hall, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NOS. D-1-DC-05-301948 & D-1-DC-07-900170

HONORABLE WILFORD FLOWERS, JUDGE PRESIDING





O P I N I O N


 In Pitonyak v. State, 253 S.W.3d 834 (Tex. App.--Austin 2008, pet. ref'd), this Court
affirmed the conviction of Colton Pitonyak, an intermittent University of Texas student, for the
murder of twenty-one year-old Jennifer Cave, whose dismembered body was found in Pitonyak's 
West Campus-area condominium. Pitonyak was apprehended after fleeing to Mexico in the
company of Laura Ashley Hall, a fellow UT student. This appeal arises from subsequent criminal
proceedings against Hall.

 Following a jury trial, Hall was convicted of the felony offense of tampering with
physical evidence--namely, a human body or body part--and the misdemeanor offense of hindering
apprehension. See Tex. Penal Code Ann. §§ 37.09(c), (d)(1), 38.05(a), (c) (West Supp. 2008). 
Punishment was assessed at five years' imprisonment for the evidence-tampering offense and one
year's imprisonment for hindering apprehension. Hall appeals, bringing seven points of error.

 In her first two points, Hall seeks a new trial based on the State's advocacy of what
she contends were inconsistent factual theories during her trial and Pitonyak's trial. Her third
and fourth points raise claims of charge error. In her fifth and sixth points, Hall seeks a new trial
based on allegations that the State suppressed or withheld evidence in violation of a discovery order
and the Due Process Clause of the Fifth and Fourteenth Amendments, as construed in Brady
v. Maryland (1) and its progeny. In her seventh point, Hall seeks, in the alternative, a new punishment
trial based on an additional claimed Brady violation.

 We agree with Hall that the State suppressed evidence in violation of a discovery
order and Brady. While we conclude that these actions ultimately did not cause reversible error in
Hall's convictions, they do require a new trial on her punishment.


BACKGROUND

 Although Hall does not challenge the sufficiency of the evidence supporting
her convictions, several of her appellate points must be evaluated in the context of the evidence
presented at trial. We accordingly review the evidence in some detail.


Jennifer Cave's disappearance, death, and discovery

 When last seen alive, Jennifer Cave was with Colton Pitonyak in Austin's Sixth
Street district during the late evening hours of Tuesday, August 16, 2005. On this particular evening,
the pair was celebrating a new job that Cave had obtained with an Austin law firm, which she was
to start the following day. By all accounts, Cave was very excited about her new professional
opportunity. A friend of Cave, Michael Rodriguez, testified at trial that he spoke with Cave via
cell phone several times that evening, the latest at 1:05 a.m. on Wednesday, August 17. During that
final conversation, according to Rodriguez, Cave indicated that she was still with Pitonyak, who was
beating on car windows and urinating in public.

 At approximately 3:00 a.m. that morning, according to witness Nora Sullivan--a
former UT student whose connections to the underlying events included being a "good friend" of
Pitonyak and down-the-hall neighbor in his condominium complex--Pitonyak showed up at her door
alone indicating that he had misplaced his cell phone and asking to borrow hers. Sullivan recounted
that Pitonyak, who appeared to her to be intoxicated, claimed to have exchanged gunfire at his
condo with "two or three Mexican guys." Sullivan testified that Pitonyak remained at her condo
for approximately half an hour while the two visited and smoked cigarettes on her balcony. During
their visit, Sullivan ascertained that Pitonyak had a handgun in his possession, which he unloaded
in her presence. She added that Pitonyak also asked her if she noticed any blood on him. She noted
a "smudge" of blood on Pitonyak's arm. Despite her observations and Pitonyak's statements,
Sullivan did not contact police. She told the jury that she had simply dismissed Pitonyak's tale of
a gunfight as false because she had not heard any shots.

 That afternoon, Pitonyak purchased several items from Breed & Company, a
hardware store located about four blocks from his condo: bathroom tissue, shop towels (described
as a type of heavy-grade paper towel), 55-gallon drum liners, carpet cleaner, a quart of ammonia,
Febreze odor eliminator, a two-pack of latex gloves, a small plastic-handled hack saw, and dust
masks. These items, as well as a corresponding receipt, were later recovered from Pitonyak's condo. 
The receipt indicated that the purchases were made on August 17 at 3:18 p.m. (2) Jeffrey Breed, an
owner of the hardware store, testified that he assisted a young man that afternoon in purchasing
these items from what appeared to be a handwritten list. According to Breed, the young man was
alone. Another receipt later recovered from Pitonyak's condo reflected a purchase from a nearby
Burger King at 3:26 p.m.

 In the meantime, Jennifer Cave had not shown up for work at her new job. The
law firm attempted unsuccessfully to reach her by phone, and eventually sent someone to look
for her at her apartment. Again having no success in finding her, the firm called Sharon Cave,
Jennifer Cave's mother, expressing concern. Sharon (3) testified that after receiving the call, she
made several calls to Jennifer's cell phone but did not get an answer. Sharon proceeded to contact
Jennifer's cell phone provider, obtained a list of her daughter's incoming and outgoing calls the
preceding evening, and began calling those numbers in an effort to locate her daughter.

 Through her calls, Sharon was able to determine that Jennifer had been out with
Pitonyak the preceding evening. Pitonyak's number had also appeared among Jennifer's incoming
or outgoing calls, and Sharon attempted unsuccessfully to reach him. Pitonyak later returned her
call. (4) Pitonyak, according to Sharon, acknowledged that he had been with Jennifer the preceding
evening but claimed they had parted ways around midnight. At the same time, Sharon happened to
be on a different phone line with Michael Rodriguez, the friend who had spoken with Jennifer
by phone at 1:05 a.m. Rodriguez overheard Pitonyak's statements and informed Sharon that
Pitonyak was lying because Jennifer had indicated during their later call that she was still with
Pitonyak. Sharon confronted Pitonyak with that assertion. Pitonyak, according to Sharon, "just got
mad and hung up."

 Around 6:30 p.m., Scott Engle, a former boyfriend of Jennifer, called Pitonyak. Engle
testified that "I had previously called him [Pitonyak] trying to find Jennifer as well and left him a
message and told him that I believed the cops were on their way to his house because we knew
Jennifer's car was over there." Engle added that Pitonyak's demeanor during this call was "[t]alking
fast, jittery, nervous."

 Sharon further testified that her fiancé, Jim Sedwick, was assisting her search efforts
and had left a message that evening for Pitonyak to call him. Pitonyak called back, and Sharon
answered. (5) She confronted Pitonyak, "Colton, I know that you were with Jennifer. I want to know
where she is." Pitonyak, according to Sharon, responded, "Dude, I'm eating pizza with my friends. 
Leave me alone." Thereafter, Sharon contacted Austin police to report her daughter missing. 

 On the following morning, Thursday, August 18, 2005, Sharon, accompanied by
Sedwick, drove from Corpus Christi to Austin, where they met another of Sharon's daughters
and continued efforts to locate Jennifer. Sharon testified that while en route, Austin police contacted
them and advised that Jennifer's car had been located at Pitonyak's condominium building.
Concerned about Jennifer's safety and fearing that Pitonyak was somehow involved in her
disappearance, Cave and Sedwick ultimately broke into Pitonyak's condominium. Sedwick entered
the unit. He discovered Jennifer's body in the bathtub of the unit's bathroom. Sedwick immediately
left the condo and called the police.

 Sedwick and Austin police found a gruesome scene in Pitonyak's bathroom. 
Jennifer Cave's head and hands had been severed and placed in plastic garbage bags found on
the bathroom floor. A plastic-handled hacksaw--one of the items Pitonyak had purchased at the
hardware store the preceding afternoon--was found laying on top of Cave's headless torso. There
were blood stains in the bathroom sink and on the carpeted floor of the condo's living area.

 Police also found two bullet or shell casings on a table in the condo's living room. 
An additional shell casing was found in the bathtub with Cave's body. On the living room table
was also found a folding buck knife and one of the blue shop towels. Each of these items, as well
as the hacksaw, later tested positive for blood. A dishwashing machine in the unit's kitchen area 
contained a machete and a steak knife. Also found in the unit were the other hardware items, an
"Ace Hardware" bag, and the hardware store receipt, previously described. A pair of women's flip
flops was also found on the bathroom floor near the bathtub and toilet.

 Medical examiner Elizabeth Peacock performed an autopsy on Cave's body and
testified on its results at trial. (6) She determined that Cave had been killed by a gunshot that
had passed through Cave's right arm into her chest, severing her aorta, before the bullet lodged
near her back. Peacock could not determine an exact time of death, but opined that unconsciousness
and death would have followed quickly after Cave had been shot. Based on the absence of
gunpowder residue on Cave's body, Peacock determined that the fatal shot had been fired from at
least eighteen inches away.

 On Cave's left hand was a stab wound that, according to Peacock, occurred at or
shortly after the time of death. Peacock acknowledged that the wound might have been defensive
in nature. There were also clusters of stab wounds in Cave's upper right chest and on the right side
of her face and neck. The stab wounds were determined to have been made by the same knife and
were described as symmetrical and in line, although some intersected into "Vs." Peacock opined that
the stab wounds, as well as the severing cuts to Cave's head and hands, were made between four and
twenty-four hours after death. The severing cuts, according to Peacock, would have been "difficult"
to make, especially the cut through the spine. During the autopsy, Peacock also discovered a bullet
inside Cave's skull. She determined that the bullet had been fired into the head post-mortem through
Cave's severed neck.

 Pitonyak's car was found outside the condominium building. Inside it was a semi-automatic handgun. Forensics tests determined that the two bullets found inside Cave's body and
the three shell casings found in the condo were fired from this gun.

 A warrant subsequently issued for Pitonyak's arrest for murder. With the assistance
of Mexican authorities, Pitonyak was eventually located in a hotel room in Piedras Negras. He
was in the company of appellant Hall. Mexican authorities expelled the pair from the country at the
Del Rio border crossing on August 23, 2005, where Pitonyak was promptly arrested by U.S.
authorities. He was later indicted for murder, convicted, and sentenced to a fifty-five-year prison
term. As noted, this Court affirmed his conviction on appeal. See Pitonyak, 253 S.W.3d at 844-57. 


Criminal proceedings against Hall

 On September 20, 2005, Hall was indicted on a felony count of hindering
apprehension or prosecution. See Tex. Penal Code Ann. § 38.05. Section 38.05 of the penal code
provides, in relevant part, that a person commits an offense "if, with intent to hinder the arrest,
prosecution, conviction, or punishment of another for an offense . . . he: (1) harbors or conceals
the other; [or] (2) provides or aids in providing the other with any means of avoiding arrest or
effecting escape." See id. § 38.05(a)(1), (2). The offense is a Class A misdemeanor unless "the
person who is harbored, concealed, [or] provided with a means of avoiding arrest or effecting escape
. . . is under arrest for, charged with, or convicted of a felony . . . and the person charged under this
section knew that the person they harbored, concealed, [or] provided with a means of avoiding arrest
or effecting escape . . . is under arrest for, charged with, or convicted of a felony," in which case the
offense is a third-degree felony. See id. § 38.05(c), (d). Hall's indictment for this offense alleged
in two separate paragraphs that Hall "on or about August 19, 2005, in the County of Travis, and State
of Texas, did then and there, with intent to hinder the arrest, prosecution, conviction or punishment
of Colton Pitonyak for the offense of murder," and while knowing "that the said Colton Pitonyak
was charged with a felony, namely, Intentional Murder," (1) "harbor or conceal Colton Pitonyak"
and (2) "provide or aid Colton Pitonyak with means of avoiding arrest of effecting escape, to-wit:
the Defendant assisted Colton Pitonyak in his flight from the State of Texas and provided
transportation for Colton Pitonyak in his flight from the State of Texas."

 On June 7, 2007, after Pitonyak was convicted of murder, Hall was indicted on a
second-degree felony count of tampering with physical evidence. See id. § 37.09. In relevant part,
section 37.09(d)(1) of the penal code provides that a person commits an offense if the person,
"knowing that an offense has been committed, alters, destroys, or conceals any record, document,
or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent
investigation of or official proceeding related to the offense." Id. § 37.09(d)(1). The offense is a
third-degree felony "unless the thing altered, destroyed, or concealed is a human corpse, in which
case the offense is a felony of the second degree." Id. § 37.09(c). Hall's indictment for this offense
alleged that Hall, "on or about August 17, 2005"--the date Cave was discovered missing and
Pitonyak made his hardware store purchases-- and "in the County of Travis, and State of Texas,
did then and there, knowing that an offense, to wit: a murder, had been committed, alter or destroy
or conceal a thing, to wit: a human body and biological evidence, with intent to impair its verity
or availability as evidence in any subsequent investigation of or official proceeding related to
the offense."

 The two charges against Hall were consolidated for trial. Neither Hall nor Pitonyak
testified at her trial.



 Hall's participation in the Mexico trip

 The evidence implicating Hall in the charged offenses included the undisputed facts
that during the evening of August 17, 2005--after Pitonyak learned that authorities might be
suspecting him of being involved in Jennifer Cave's disappearance--Hall and Pitonyak left Austin
and drove to Mexico in Hall's car. Hall and Pitonyak's cell phone records tracked the pair's path
south through New Braunfels during the 10 o'clock hour, then westward along U.S. 90 to Del Rio
and the Mexican border. Along the way, Hall received a speeding ticket in Val Verde County, an
indication that she was driving. The pair crossed the border into Mexico at 2:36 a.m. on the morning
of August 18. Surveillance photographs from the border checkpoint shows the license plates on
Hall's Cadillac, and the car was later recovered by authorities when the pair was apprehended in
Mexico. There was no evidence that Hall sought assistance from the authorities she encountered on
her way to Mexico with Pitonyak.

 The jury also heard evidence that Hall made preparations for the trip earlier in the day. 
A receipt recovered from Hall's Cadillac reflected a 3:47 p.m. purchase of approximately 19 gallons
of gasoline and a car wash from a station located on East Oltorf in southeast Austin. This purchase
occurred at roughly the same time as Pitonyak's purchases from the hardware store and Burger King
several miles away near the UT campus. The State conceded during closing argument that there
was "no doubt" Pitonyak and Hall "were not together the entire day," but urged that Hall's gassing
up and washing her car a few hours before leaving town was probative of a common plan with
Pitonyak that included their respective "errands." Later that evening, but before the pair left Austin,
Hall, accompanied by Pitonyak, stopped off at the apartment of some friends and picked up a bottle
of rum or vodka she had previously left there. One of the roommates, Star Salzman, testified that
Hall appeared "normal" and not in fear in any way.


 Hall's presence at the crime scene

 The State also presented evidence of contemporaneous eyewitness perceptions,
physical evidence, and phone records tending to show that Hall had been to Pitonyak's condo on
August 17 before the pair left for Mexico. Cell phone records reflected a series of text and phone
communications between Hall and Pitonyak beginning in the early morning hours of August 17. (7) 
At the time, Hall had been staying overnight at the apartment of Star Salzman and his roommates
(the apartment to which she later returned to pick up her liquor on her way out of town). Another
of the roommates, Ryan Martindill, testified that Hall woke him at around 7:00 a.m. and asked
him to drive her to her apartment so she could pick up her car. He did. According to Martindill, he
understood that Hall was going to meet with Pitonyak and that "I think she said he was going to be
leaving soon and she wanted to go spend some time with him."

 The jury heard testimony about DNA testing performed on numerous items and sites
at the crime scene, including the hacksaw, machete, buck knife, bloodstains in the living room and
bathroom, various cloths or towels, and two dust masks found in the bathroom. Hall was statistically
excluded as a contributor of DNA found on every item and site except for a blue shop towel found
on a living room table--one of the items Pitonyak had purchased from the hardware store during
the afternoon of August 17--and one of the women's flip flops found in the bathroom. Neither
Pitonyak nor Hall could be excluded as contributors of DNA found on the shop towel, and the
probability of Hall being excluded as a contributor was 1:43. As for the DNA found on the flip-flop,
neither Pitonyak, Hall or Cave could be excluded as contributors, and the probability of Hall being
excluded as a contributor was 1:402.

 DNA testing was also performed on the handgun recovered from Pitonyak's car. 
Neither Pitonyak nor Hall could be excluded as contributors of DNA found on the pistol's grip, slide,
or magazine. The probability of Hall being excluded as a contributor of DNA found on the grip was
1:1,112 and, for the slide and magazine, 1:88.

 The State's DNA expert, Cassie Carridine, acknowledged that Hall's probabilities
of exclusion fell below the astronomical levels that would have constituted a conclusive "match." 
By comparison, Carridine explained that Hall was determined conclusively to be the contributor
of DNA found on women's underwear and a pair of sweat pants recovered from her car; her
possibility of exclusion for each of these items was 1:18.71 quadrillion. As another example, Cave
was determined conclusively to be the contributor of DNA found on the hacksaw--her probability
of exclusion was 1:130.1 quadrillion--and Pitonyak and Hall were excluded as possible
contributors. (8) Carridine also acknowledged that DNA testing could not necessarily determine
when a contributor had contact with a tested item or whether the item had been moved. During its
subsequent deliberations, the jury asked for Cassidine's testimony "in relation to the blue shop rags,
the sandals from the bath room and the gun grip and magazine" to be read back to them.

 The jury also heard evidence tending to establish that anyone who had been in
Pitonyak's condo during the day on August 17 would have known about Cave's shooting and death.
Police investigators described Pitonyak's condo as a one-bedroom efficiency, with a living and
sleeping area, kitchen area, and single bathroom. The jury could reasonably have inferred that in this
small area, Hall could not have missed such telltale signs as shell casings and a blood stain in the
living room--much less overlooked a dead body in the bathtub if she had entered the bathroom. (9)


 Hall's motive

 The State also presented evidence that Hall was highly motivated to protect Pitonyak
or otherwise seek his favor without regard to his involvement in a grisly crime and even if it meant
breaking the law. It was undisputed that Hall had a very strong and somewhat obsessive romantic
interest in Pitonyak, while it appeared that Pitonyak was somewhat less interested. (10) Joseph Smith,
a deputy U.S. marshal present when Pitonyak was arrested at the border, testified that Hall "made
statements regarding her love for Colton, that she wanted to get him out of jail, that she wanted to
make a phone call to talk to his attorney to get him out of jail, that she wanted to stand by him no
matter what happened, and things to that effect." Smith added that, "if someone had injured Colton,
I believe she said that she would kill anyone who hurt Colton." He added that Hall expressed the
view "that it should be up to the friends of a murder victim to avenge them and it should not be a
police matter." Two days later, Hall returned to Austin, where she spent some time with Salzman
and Martindill. Despite the murder charges pending against Pitonyak and what the record reflects
was knowledge among her friends regarding the widely publicized macabre scene in his condo, Hall
obtained a new tattoo of the name "Colton."

 Hall and the State advanced competing theories during trial to explain her interest
in Pitonyak. Hall's counsel attempted to portray her essentially as the manipulated victim of a
"sociopath," who, at most, had exhibited bad youthful judgment in falling sway to the wrong kind
of guy. The State portrayed Hall as a more menacing figure. There was evidence that Hall--like
other friends of Pitonyak, including Cave--was aware that Pitonyak dealt drugs, was somewhat
unstable, brandished guns or knives, and cultivated a gangster or "bad guy" persona. The State
presented evidence to the effect that Hall reveled in the role of the gangster's girlfriend and shared
Pitonyak's dark traits. It was able to introduce a printout of Hall's Facebook page--last updated on
August 15, 2005--reflecting, among other things, that Hall's "Summer Plans" included "I should
really be more of a horrific person. Its in the works." (11)


 Hall's self-incriminating admissions

 To fill in the remaining gaps in its theory that Hall not only helped Pitonyak flee the
country to avoid a murder charge, but helped dismember Cave's body with intent to impede its use
as evidence, the State relied on the testimony of four witnesses--Said Aziz, Henriette Langenbach,
Nora Sullivan, and Javier Rosalez. Each of these witnesses recounted alleged self-incriminating
admissions by Hall during the months before trial. (12)


 Said Aziz

 Aziz testified that he had been a friend of Hall, Cave and Pitonyak while a student
at UT. He recounted that Hall had called him seeking advice during the early morning hours of
August 23, 2005, a few hours after she and Pitonyak were expelled from Mexico. Aziz ultimately
spoke with Hall three times that day. During their first conversation, at approximately 6:30 a.m.,
Hall, according to Aziz, described the Mexican police kicking in the door to the hotel room where
she was staying with Pitonyak and taking him away, adding, "I can't believe they found us so fast." 
Aziz, who had previously heard that authorities had been looking for Pitonyak in connection with
a murder, asked Hall how long she had been involved in the situation. Hall, Aziz claimed, replied,
"I have been all up in this shit since two hours after it started."

 Hall, according to Aziz, indicated she would tell the police that she "just thought they
were on vacation." Aziz responded "that my advice would be to start talking to police and tell the
truth in order to stay out of trouble." He concluded their first call by telling Hall that he was going
back to sleep and would call her again later. They next spoke around 11:30 a.m. According to Aziz,
"Laura said that she wanted to protect Colton and help him. . . . I do recall specifically that I became
more agitated and I angrily told Laura that I could understand it being accidental if Colton had just
shot Jennifer one time. I couldn't believe that it was accidental with him stabbing her repeatedly
and the other stuff." Aziz asked Hall how the pair got to Mexico. Hall replied that she drove, adding
that they went in her own car. Aziz then "asked Laura why she would want to help somebody
who killed a girl very much like herself, to which she replied that she loves him, and, quote, 'that's
just how she rolls.'"

 Hall, according to Aziz, also said she was not going to turn her back on Pitonyak,
to which Aziz exclaimed that "I thought she was crazy and I was revolted by this crime." He
also indicated that "She refused to believe that people would help the police. I don't understand
necessarily why."

 Aziz contacted the Austin Police Department and agreed to give a statement. At
3:35 p.m., as Aziz was in the parking lot by police headquarters preparing to go inside, he spoke to
Hall again. Aziz described Hall as confused and distraught. She told him that the police were at her
parents' house investigating her involvement in the matter. Hall, according to Aziz, now claimed
that "she didn't know what was happening until the Mexican police came in." (13) Aziz "asked her to
clarify" in light of the inconsistency with her prior statements, and asked her point-blank if she was
lying then or had lied in her previous statements. Hall, Aziz indicated, stated that she had lied in first
statement. He continued, "I asked her if she had just been blustering to appear tough and hard. She
replied that she guessed so."


 Henriette Langenbach

 After she was charged with hindering apprehension, Hall was held for a period of
time in the Travis County Jail. She shared a cell with Henriette (also known as Erika) Langenbach,
who was being held on two felony counts of securing the execution of a document by deception
and a felony count of misappropriating property by a fiduciary. At the time of trial, Langenbach was
on probation for these offenses. She provided by far the most detailed account implicating Hall in
the charged offenses.

 Langenbach, who was in her early sixties, claimed that she developed a "motherly
relationship" with Hall during their time together and that they had extensive conversations about
Pitonyak and the Cave matter. Langenbach claimed that Hall professed that "she loved [Pitonyak]
very much." She added that Hall seemed to perceive the murder victim, Cave, as a romantic
rival, appeared to be "extremely jealous" of Cave, and would typically refer to Cave as "f*cking
waitress ho."

 Langenbach provided the jury essentially a step-by-step narrative of events
in Pitonyak's condo during the hours before Hall and Pitonyak left for Mexico. According to
Langenbach, Hall "told me that when Colton called her at 5:30 in the morning, and when she arrived
there, that he took her to the bathroom and showed her the body." Langenbach claimed Hall told her
that Pitonyak admitted shooting Cave and stabbing her body to make sure she was dead. After
viewing the body in the bathtub, Hall then supposedly recounted that she and Pitonyak "first sat on
the couch and talked about things." Later, Hall purportedly told Langenbach, she used the bathroom
toilet--in the same bathroom where Cave's body lay--after Pitonyak closed the shower curtain to
conceal the body in the bathtub.

 Hall, according to Langenbach, described Pitonyak's demeanor at the time as drunk,
drugged, "just beside himself," "worth nothing," and "freaking out." Hall supposedly claimed that
Pitonyak initially wanted to flee to Detroit or his parent's house, but that she had convinced him
this plan was foolish because he would get caught. Hall also allegedly revealed that "it was their
plan to dispose of the hands, the feet and her head and put it in Colton's car and drive it to a lake
somewhere and dispose of the car that way with the body parts in it." When asked if Hall indicated
whose idea it was to dismember Cave's body, Langenbach testified that Hall "gave me the
impression that she was in charge of this operation" by portraying herself as "the one with the cool
head," while "all [Pitonyak] did was either scream or cry or swear." Hall also supposedly boasted
that Pitonyak had originally sought her out for help precisely because of her cool-headed character. 
 Hall, Langenbach continued, claimed that she "told Colton to get the stuff he was
supposed to get" and made him a list. The pair then separated to run errands. Hall went to the bank
and to get gas, cigarettes, and something to eat and drink. Langenbach testified that she asked
Hall, with apparent reference to Breed & Company, why Pitonyak went "to a small place like that"
rather than "Home Depot." Hall allegedly remarked that "the sweetheart, he's extremely intelligent,
but when it comes down to this, he just doesn't know."

 According to Langenbach, Hall told her she rejoined Pitonyak at a pizza restaurant. 
While Pitonyak was eating, Hall purportedly recounted, he received a call from Sharon Cave,
"freaked out," and "basically rushed through lunch." The pair went back to Pitonyak's condo
"because they had made the decision already to go to Mexico then and they needed stuff from
the apartment." Hall allegedly "told me that she was the one that made the decision to go to Mexico
because . . . she speaks fluent Spanish." While gathering belongings, Hall, according to Langenbach,
observed that Cave's head and hands had been placed in black and white plastic bags, a description
consistent with the evidence from the crime scene. The pair then drove to Mexico. Langenbach
claimed that Hall described her time with Pitonyak in Mexico as "the six happiest days of her life."

 Langenbach further testified that Hall told her the pair sought out a hotel with an
Internet connection "to stay on top of things because they were worried that they had found the
body in the meantime and that they would be looking for Colton." Hall purportedly also indicated
that they had planned to sell her car to get money to travel to Switzerland or Brazil, but ran into the
obstacle that Hall had not brought the car's title. Hall also allegedly admitted to Langenbach that
she and Pitonyak discussed different versions of the "story that they would have for the police."

 Langenbach also testified that Hall described details about the dismemberment,
including where Cave's hands were severed, and further observed, "if you cut up a dead body, there
wouldn't be that much blood" because blood would no longer be circulating. She also accused
Hall of bragging, "How many grandmothers can tell their grandchildren that they cut up a body?" Langenbach described Hall's demeanor regarding the horror of these acts "as just
very cold, very unfeeling." She added that Hall attributed her ability to run errands, eat, and perform
other everyday tasks under these circumstances to Hall's opinion that "intelligent people are able to
compartmentalize things." Langenbach further testified that Hall claimed she "didn't understand
what the big fuss was about" because, as Hall supposedly put it, Cave "was nothing. She was
nobody. Colton had a full paid scholarship and Jennifer was just a waitress."


 Nora Sullivan

 Sullivan was the friend of Pitonyak whom he had visited at approximately 3:00 a.m.
on August 17. After giving her account of Pitonyak's visit, which we have previously summarized,
Sullivan testified that she had visited Pitonyak in the Travis County Jail between five and ten times,
and that Hall had accompanied her on one of those visits in the spring of 2006. Over vigorous
objections from Hall's counsel, Sullivan was permitted to testify that Hall had made several key
admissions following the jail visit. The basis of Hall's objection was that the State had violated a
discovery order by failing to disclose Hall's alleged self-incriminating statements prior to trial.

 Hall, according to Sullivan, acknowledged that she had been in Pitonyak's apartment
after Cave's death and that Pitonyak had been engaged in "his task" of dismembering Cave's body. 
Sullivan further claimed that Hall "said that he [Pitonyak] was procrastinating and sitting in the
living room and watching TV and drinking beer" and that she had "tried to motivate" Pitonyak "to
get him to do it . . . to convince him and get him moving." When asked if Hall had indicated
whether she played any direct role in the mutilation or dismemberment or Cave's body, Sullivan
testified, "She didn't outright say so, but that was the impression I was given."


 Javier Rosalez

 During the summer of 2006, Hall was working as a server at the Baby Acapulco
restaurant on Austin's Barton Springs Road. One of Hall's co-workers was Javier Rosalez, who
acknowledged having prior felony convictions for drugs and DUI for which he had served prison
time. Rosalez testified that restaurant staff had heard the "buzz" about the Cave death and
dismemberment and became aware that the co-worker they knew as "Ashley"--Laura Ashley
Hall--had been implicated in some manner. Rosalez probed Hall about it. He claimed that Hall was
initially reluctant to discuss the matter, citing an ongoing investigation, but eventually opened up to
him and "almost seemed kind of boasting at times." Hall, according to Rosalez, "said she had--she
had helped and then masterminded the escape to Mexico." However, Rosalez testified that Hall did
not further elaborate on the extent or nature of her "help." He also denied that Hall had claimed to
be the "mastermind" of Cave's dismemberment.

 Rosalez added that Hall claimed "they would have gotten away with it" if she had
not called her father from Mexico, which had prompted her father to turn them in. Rosalez also
testified that he got into a heated argument with Hall after she once dismissed the incident as "a
victimless crime" and opined that "they deserved to get away with it because they had already been
locked up and they had learned their lessons."

 On cross-examination, Rosalez admitted that he had gossiped to his co-workers
about Hall's purported statements to him, but did not contact police. He acknowledged that he
divulged these statements to police only after police, having eventually heard about Rosalez's
statements to his co-workers, showed up at his house. At the time, Rosalez was still on parole. 
Hall's trial counsel urged the jury to infer that Rosalez, fearing adverse parole consequences, had
spread false or greatly embellished rumors about Hall, then stuck by these stories after authorities
confronted him. The State countered by suggesting that Rosalez had far more to fear from a perjury
charge if his account of Hall's admissions proved to be false.


 Verdict

 The district court submitted the felony charge of hindering apprehension or
prosecution with the lesser-included offense of misdemeanor hindering apprehension or prosecution. 
See Tex. Penal Code Ann. § 38.05(a),(c), (d) (offense is a felony if the defendant "knew that the
person they harbored, concealed, [or] provided with a means of avoiding arrest or effecting escape
. . . is under arrest for, charged with, or convicted of a felony," and is otherwise a misdemeanor). 
The jury found Hall not guilty of the felony offense but convicted her of the lesser-included
misdemeanor.

 The district court separately submitted the offense of tampering with physical
evidence with a lesser-included offense of attempted tampering with physical evidence. See id.
§ 37.09(d)(1). It refused a timely request from Hall to submit a lesser-included offense charge on
the offense of failure to report human remains. See id. § 37.09(d)(2). The jury found Hall guilty of
tampering with physical evidence as charged in the indictment.


 Punishment phase

 The issue of Hall's punishment was then tried to the jury. The State called a single
additional witness, Douglas Conley. Conley testified that he was working as a taxi driver during the
morning of August 6, 2006, when he picked up a woman, "Ashley," from a West Campus-area
residence and drove her to the Baby Acapulco's on Barton Springs Road. In the courtroom, Conley
identified the "Ashley" from his cab as Hall. The State elicited Conley's testimony that Hall had
made disparaging comments about Cave and exhibited a demeanor toward the victim that he
characterized as "just cold, callous."

 Conley recounted that he and "Ashley" had a conversation in which she divulged
that she was having trouble getting into law school because of a pending felony charge. Upon
inquiry, "Ashley" told Conley that the charge was harboring a fugitive, further indicating that the
fugitive was her boyfriend, that he was charged with murder, and that he was innocent. Conley
claimed that "Ashley" referred to the murder victim as "some bitch." According to Conley, "Ashley"
elaborated that the victim had caused her "a lot of difficulty"and that the person was "Jennifer Cave."

 Hall presented her father, Loren Hall. He testified that his daughter had a history
of academic success; working for prominent Austin law firms and lawyers; and participating
in wholesome activities like debate, swimming, and rowing. According to Loren, his daughter's
personality and demeanor changed dramatically for the worse after she met Pitonyak. These
changes, he claimed, included frequent use of derogatory terms for women. Loren added that after
enduring her "trauma and things she was through with Colton," Hall had been taking medication to
control her affect and moods, that she had improved, and that "she is trying to improve herself . . .
building herself back up, having more respect for people." Loren pleaded with the jury to give
his daughter probation, urging that she would work hard to rehabilitate herself if given the chance. 
He cited an example of Hall having worked hard to overcome difficulties and succeed in a college
math course.

 Hall also called Jason Mack, a former roommate of Pitonyak who also had known
Hall and Cave. Mack testified that Pitonyak had borrowed money from Hall because he had
needed to pay some "pretty bad characters." Mack recounted that Hall came to Pitonyak's condo
two days before Cave's murder to discuss the money issue with him. At the time, according to
Mack, Pitonyak was drinking, drugged, "spazing out" because his anxiety medication had run
out, and "had been up about nine days." Mack claimed that Pitonyak physically threw Hall out of
his condo. While Hall "was outside on the steps crying because [Pitonyak] had thrown her out,"
Pitonyak, Mack indicated, pulled a gun out of a drawer and stated, "This bitch is getting on my
f*cking nerves. I'm going to shoot her." Mack eventually calmed him down, but later warned Hall
that "you are going to get yourself killed" and that Pitonyak "is not in his right mind," "hadn't slept
in nine days," and "is getting delusional."

 The jury imposed a sentence of five years' incarceration for the evidence-tampering
conviction, the maximum one year for hindering apprehension, and did not recommend community
supervision for either conviction.


 Post-judgment proceedings

 Hall filed a motion for new trial or, alternatively, a new punishment trial. Of
relevance to this appeal, Hall argued that the State had wilfully violated a discovery order by
failing to disclose Hall's alleged statements to Nora Sullivan. She also asserted that the State had
violated Brady by failing to disclose impeachment evidence against Henriette Langenbach and
Douglas Conley that she had discovered after trial. Both sides presented affidavits and documentary
evidence. After a hearing, the district court overruled Hall's motion in its entirety and subsequently
entered findings of fact and conclusions of law. This appeal followed.


ANALYSIS

Inconsistent theories

 Hall's first two points of error are predicated on her assertion that the State advocated
a factual theory of her involvement in Cave's dismemberment during her trial that was inconsistent
with its theory during the Pitonyak trial. Citing excerpts from the closing arguments at each trial,
Hall argues that during the Pitonyak trial "the State argued that it was Pitonyak's idea to mutilate the
body and the evidence showed appellant did not participate," while "the theory and argument were
exactly opposite" in her trial. In her first point of error, Hall argues that this claimed inconsistency
violated her due process rights. See Thompson v. Calderon, 120 F.3d 1045, 1056-59 (9th Cir. 1997)
(en banc), rev'd on other grounds, 523 U.S. 538 (1998); see also Smith v. Groose, 205 F.3d 1045,
1052 (8th Cir. 2000) (holding "that use of inherently factually contradictory theories violates
the principles of due process."). In her second point of error, Hall similarly contends that the State
should have been judicially estopped from advocating its "inconsistent" theory in her trial. See
Arroyo v. State, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003). The State disputes whether Hall
preserved her due process complaint and asserts several reasons why it believes neither doctrine is
implicated on the record here. We need only hold that there is no inconsistency between the State's
theories at each trial that would implicate either due process or judicial estoppel.

 During his trial, Pitonyak attempted to refute the mens rea element of murder by
claiming that he had no recollection of shooting Cave and that he would not have harmed her
intentionally. As for what Cave's subsequent dismemberment and his flight might imply about
his awareness of guilt, Pitonyak attempted to shift the blame for those acts to Hall. He denied any
personal recollection of cutting the body himself and claimed that, after purchasing the hardware
items, "I tried to go in there and do some cutting, but couldn't." During closing argument, the State
attacked Pitonyak's claims by emphasizing the relative amounts of DNA evidence linking Pitonyak
to the dismemberment as compared to Hall:


That mutilation shows you, that flight to Mexico shows you, he had a guilty
conscience. He knew what he had done, he knew he shouldn't have done it, and he
was going to get out of there.


 They again want to blame [Laura Hall (14)] for all of that. That's all her doing. 
But, ladies and gentlemen, the evidence doesn't support that. . . . That mutilation
and trip to Mexico was Colton Pitonyak's idea. And I will tell you why I know that. 
Look at the DNA. The only five places in this case [where] you see DNA of
Laura Hall are two items of female clothing in a backpack that came back from
Mexico, on a blue shop towel on the coffee table in front of the couch, on that
handgun and on a sandal by the toilet in the bathroom. Those are the only five
places. And these two men want you to believe that this one hundred whatever
pound girl mutilating a body for hours, causing all sorts of injuries, doing what
Dr. Peacock [the medical examiner] described as all kinds of work, she managed to
do it without leaving any DNA. She is an absolute genius. The evidence doesn't
support that.


 There is a green washcloth with his blood. There is a pair of jeans in
the washer with his blood. There is a faucet knob with a combination of Jennifer
and Colton. There is a smear on the wall, blood, and Colton. There is a smear in
the bathtub, Jennifer and Colton. That same shop towel that had Laura Hall,
Colton Pitonyak, and he, too, is on that gun. . . . You don't get injured, you don't
bleed as a result of an accidental gunshot being fired. You get injured mutilating a
body in a bathtub.



During Hall's trial, the State argued:


 If you have any doubt that Jennifer Cave was altered, destroyed or concealed,
(demonstrating), that is Jennifer Cave. And the manner in which she was found was
altered, it was destroyed, it was concealed in bags. That's the offense.


 You know Laura Hall was involved in that because of what she told people.
. . . "All up in that" does not mean that you had no idea there was a body in that
bathtub. She knew from two hours after he killed Jennifer Cave what they needed
to do to avoid his conviction, his prosecution, his punishment and conviction. And
that plan went into action with a 13-minute phone call at 6:00 a.m. on August 17th.


 The next statement would be Henriette Langenbach. . . . There were two
white bags, one for the hands, one for the head. She told you that Laura Hall told her
that the feet, the hands and the head are used for identification purposes. . . .


 The course of actions during the next day. He . . .went to Breed's, I went to
gas the car. . . . 


 The next statement she made was to Nora Sullivan after her release from jail
. . . Nora told you what Laura said, is that she was the mastermind behind the
tampering with the evidence[ (15)]. . . . Nora told you she [Hall] was frustrated because
Colton wouldn't do what Colton needed to do. . . . She acted with the intent to make
sure that he didn't get arrested, convicted, punished for the offense of murder. In
doing so, she helped him get to Mexico, she helped get him out of Apartment 88 at
2529 Rio Grande. She helped mutilate that body, and she did whatever she could to
try to make sure those items were not available in any subsequent proceeding against
Colton Pitonyak. And yes, they failed to finish the job, but that does not get you to
attempt. Attempt is only if you find that she [Cave] was not altered or concealed or
destroyed.



 Hall characterizes the State's arguments before the Pitonyak jury as tantamount to
an assertion that she was innocent of any involvement in Cave's dismemberment. To the contrary,
as the district court observed when rejecting this argument below, "[i]t looks like [the State] is saying
that [Hall] alone could not have done that," not that Hall had not participated in the dismemberment
to any extent. The State's theory in the Pitonyak trial, in other words, was that Pitonyak must have
been heavily involved in the dismemberment because Hall left relatively little DNA and this fact was
inconsistent with the sort of struggle Hall would have had if she had acted alone in cutting through
Cave's spine and hands. This theory does not logically foreclose or contradict the State's theory
during Hall's trial that "[s]he helped mutilate that body" in some manner and was culpable at least
as a party. At most, there may be some potential tension between the State's current depiction of
Hall as the "mastermind" of the evidence-tampering scheme and its arguments before the Pitonyak
jury that the "mutilation and trip to Mexico was Colton Pitonyak's idea." However, these two views
can be reconciled to the extent that Hall could have been the mastermind of a plan for accomplishing
a dismemberment that Pitonyak had initially conceived.

 To violate due process, an irreconcilable inconsistency must exist at the core of
the State's cases. See Groose, 205 F.3d at 1050-52 (due process violated by contradictory theories
in murder trials of co-defendants--in one case, that the victims had been killed before a defendant
began to participate in a burglary, and in the other, that the victims had been killed after the
defendant began to participate in the burglary). There was no such inconsistency here. We overrule
Hall's first point of error.

 We similarly conclude that judicial estoppel is not implicated here. Judicial estoppel
prohibits a party who has taken a position in an earlier proceeding from subsequently taking a
contrary position. Davidson v. State, 737 S.W.2d 942, 948 (Tex. App.--Amarillo 1987, pet. ref'd);
see Pleasant Glade Assembly of God v. Schubert, 264 S.W.3d 1, 11-13 (Tex. 2008) ("The doctrine
of judicial estoppel precludes a party from adopting a position inconsistent with one that it
maintained successfully in an earlier proceeding.") (citations omitted). The doctrine is not, strictly
speaking, estoppel, but rather "arises from positive rules of procedure based on justice and
sound public policy." Davidson, 737 S.W.2d at 948. Its essential function is to prevent litigants
from taking contradictory positions in successive proceedings. Id. Concluding that there is no
inconsistency in the State's theories against which justice or sound public policy would require
judicial estoppel's application here, we overrule Hall's second point of error.


Charge error

 Refusal to submit failure to report human remains

 The offense of tampering with physical evidence for which Hall was convicted is
defined in section 37.09(d)(1) of the penal code, and section 37.09(c) makes the offense a third-degree felony if the thing tampered with is a "human corpse." See Tex. Penal Code Ann. § 37.09(c),
(d)(1). Subsection (d)(2) of that statute defines a misdemeanor offense of failure to report human
remains. See id. § 37.09(d)(2). In her third point of error, Hall argues that the district court abused
its discretion in refusing her request to submit a lesser-included-offense charge on failure to report
human remains with the court's charge on tampering with physical evidence.

 We review the district court's decision regarding a lesser-included-offense charge
for abuse of discretion. See Threadgill v. State, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). A
trial court may instruct the jury on a lesser-included offense if (1) the offense in question is a lesser-included offense under article 37.09 of the Texas Code of Criminal Procedure, and (2) the record
contains some evidence that would permit a rational jury to find the defendant guilty only of
the lesser-included offense. See Hall v. State, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005). This
two-pronged test is often referred to as the Aguilar/Rousseau test. See id. (citing Aguilar v. State,
682 S.W.2d 556, 558 (Tex. Crim. App. 1985); Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim.
App. 1993)).

 An offense is a lesser-included offense if:


(1) it is established by proof of the same or less than all the facts required to
establish the commission of the offense charged;


(2) it differs from the offense charged only in the respect that a less serious injury
or risk of injury to the same person, property, or public interest suffices to
establish its commission;


(3) it differs from the offense charged only in the respect that a less culpable
mental state suffices to establish its commission; or


(4) it consists of an attempt to commit the offense charged or an otherwise
included offense.



Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006). Hall urges that the offense of failure to report
human remains is a lesser-included offense because it is established by proof of the same or less than
all the facts required to establish the commission of the charged offense of tampering with physical
evidence. See id. art. 37.09(1).

 The court of criminal appeals has explained that "the facts required to establish
the commission of the charged offense" under this analysis refers to the facts as alleged in the
charging instrument. See Hall v. State, 225 S.W.3d 524, 534-35 (Tex. Crim. App. 2007). Therefore,
"the determination of whether a lesser-included offense is involved should be made by comparing
the elements of the greater offense, as the State pled it in the indictment, with the elements of the
statute that defines the lesser offense." Peavey v. State, 248 S.W.3d 455, 467 (Tex. App.--Austin
2008, pet. ref'd). This component of our analysis presents a question of law. Hall, 225 S.W.3d
at 535.

 Hall's indictment for tampering with physical evidence alleged, in relevant part: 


that Laura Hall, on or about the 17th day of August, 2005, and before the presentment
of this indictment, in the County of Travis, and State of Texas, did then and there,
knowing that an offense, to wit: a murder, had been committed, alter or destroy or
conceal a thing, to wit: a human body and biological evidence, with intent to impair
its verity or availability as evidence in any subsequent investigation of or official
proceeding related to the offense.



As the offense was alleged in the indictment, the State was required to prove the following elements:
(1) Hall; (2) knowing that a murder had been committed; (3) altered, destroyed, or concealed a
human body; (4) with intent to impair its verity or availability as evidence in any subsequent
investigation or official proceeding related to the offense. The statutory elements of the offense of
failure to report human remains are: (1) a person (2) "observes a human corpse under circumstances
in which a reasonable person would believe that an offense had been committed," (3) "knows or
reasonably should know that a law enforcement agency is not aware of the existence of or location of
the corpse," and (4) "fails to report the existence of and location of the corpse to a law enforcement
agency." Tex. Penal Code Ann. § 37.09(d)(2).

 Hall argues that the indictment allegations that she knew a murder had been
committed and intentionally concealed a human body contains the failure-to-report-human-remains
statutory element of "observes a human corpse under circumstances in which a reasonable person
would believe that an offense had been committed." Similarly, Hall contends that the indictment
allegation that she "concealed" a human body contains the statutory element of "fails to report
the existence of and location of the corpse to a law enforcement agency." However, the State could
prove each element of evidence-tampering as alleged in the indictment without needing to prove
the statutory element that Hall "knows or reasonably should know that a law enforcement agency
is not aware of the existence of or location of the corpse." To the contrary, Hall could, knowing that
a murder had been committed, alter, destroy or conceal a human body with intent to impair its verity
or availability as evidence even if she knew law enforcement officers already were aware of the
corpse's existence and were on their way to the scene.

 Consequently, the offense of failure to report human remains would not be established
by proof of the same or less than all the facts required to establish the commission of the charged
evidence-tampering offense. The first step of the Aguilar/Rousseau test is not met. We need not
reach the second step. See Peavey, 248 S.W.3d at 468. We hold that the offense of failure to report
human remains is not a lesser-included offense of tampering with physical evidence as alleged in the
indictment. The district court did not abuse its discretion in refusing to submit a lesser-included
offense charge on failure to report human remains. We overrule Hall's third point of error.


 Failure to define "murder"

 Tracking the indictment, the jury charge on tampering with physical evidence required
the State to prove, among other elements, that Hall acted "knowing that an offense, to wit: a murder
had been committed." Under the penal code, a person commits "murder" if he:


(1) intentionally or knowingly causes the death of an individual;


(2) intends to cause serious bodily injury and commits an act clearly dangerous
to human life that causes the death of an individual; or


(3) commits or attempts to commit a felony, other than manslaughter, and in the
course of and in furtherance of the commission or attempt, or in immediate
flight from the commission or attempt, he commits or attempts to commit an
act clearly dangerous to human life that causes the death of an individual.



Tex. Penal Code Ann. § 19.02(b) (West 2003). The penal code further provides that "[a] person acts
intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious
objective or desire to . . . cause the result." Id. § 6.03(a) (West 2003). "A person acts knowingly,
or with knowledge, with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result." Id. § 6.03(b). Thus, to obtain the conviction for evidence-tampering, the State was required to prove that Hall was aware that Pitonyak had shot Cave with
the conscious objective or desire to kill her or cause her serious bodily injury, with awareness that
his act was reasonably certain to kill her, or in the course of and in furtherance of his commission
or attempted commission of a felony other than manslaughter. However, the jury charge did not
include this definition of "murder" from the penal code, or any definition of the term.

 In her fourth point of error, Hall argues that the district court reversibly erred in
failing to include the penal code's definition of "murder" in the jury charge on evidence-tampering. 
She urges that without this definition, the jury could "apply their own personal definitions" and "was
free to convict appellant even if they found the homicide was committed recklessly or with criminal
negligence." See id. §§ 19.04 (manslaughter, or recklessly causing the death of an individual), 19.05
(criminally negligent homicide) (West 2003).

 We review Hall's claim under the two-pronged test set out in Almanza v. State,
686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Under the first prong of the test, we
determine whether charge error exists. Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).
The State concedes that "[s]ince the jury necessarily had to use the term 'murder' in properly
resolving the issues in this case," the district court erred in failing to supply the penal code's
definition of the term. See Arline v. State, 721 S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986) ("[A]
statutorily defined word or phrase must be included in the charge as part of the 'law applicable to
the case.'"). Because the State concedes that error exists, our disposition of Hall's complaint turns
solely on the second prong of the Almanza test--whether the error caused "harm." Ngo, 175 S.W.3d
at 743. The degree of harm required for reversal depends on whether Hall preserved her charge error
complaint in the district court. If she preserved the complaint by timely objection, the record must
show only "some harm" for reversal. Almanza, 686 S.W.2d at 171. By contrast, if Hall failed to
preserve the complaint, the error would require reversal only if it resulted in "egregious harm." See
Neal v. State, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008). The State argues that Hall failed to
preserve her complaint and that the error did not cause egregious harm.

 Hall acknowledges that she never specifically objected to the district court's
failure to define "murder" in the charge, but suggests that she "[a]rguably" called the error to the
district court's attention when arguing a motion for instructed verdict on the evidence-tampering
offense. Hall relies on the following statements by her trial counsel:


Your honor, I want my record to be complete. Both sides having closed as to
the indictment on tampering, again, the defendant would request an instructed
verdict as to this charge. Looking straight at the face of the indictments, it requires
actual knowledge that an offense, a specific offense, murder, had been committed. 
Murder is a legally defined term of art. It is not synonymous with killing. It is not
synonymous with death. Murder is a legally defined conclusion, and there is no
evidence that Ms. Hall could have known a murder could have been committed. For
that reason--and there is no proof, there is nothing in the record to show that she
knew at any point that a murder had been committed . . . . Murder being a term of
art defined by law, we believe that we are entitled to an instructed verdict on that
as well.



We cannot agree that these statements preserved Hall's current complaint with the absence of a
"murder" definition in the jury charge. To preserve a complaint of charge error, Hall was required
to "distinctly specify each ground of objection" in a manner "specific and clear enough to apprise
the trial court of the nature of the objection." Pennington v. State, 697 S.W.2d 387, 390 (Tex. Crim.
App. 1985); see also Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007) (requiring that defendant
"distinctly specify[] each ground of objection" to charge). In the "arguable" objection on which
she relies, Hall never refers to the jury charge. Instead, she frames her arguments solely in terms
of sufficiency of the evidence as it bore upon her entitlement to an instructed verdict. As the State
observes, a motion for instructed verdict denotes a challenge to the sufficiency of the evidence
rather than a challenge to the form of the jury charge. See Cook v. State, 858 S.W.2d 467, 470
(Tex. Crim. App. 1993). Hall's argument at trial regarding her instructed verdict motion was
insufficiently specific and clear to apprise the district court of any additional complaint that the
court needed to add a definition of "murder" to the charge. See Pennington, 697 S.W.2d at 390. 
Consequently, we will reverse only if we find the omission of the definition resulted in "egregious
harm." See Almanza, 686 S.W.2d at 171.

 "Jury charge error is egregiously harmful if it affects the very basis of the case,
deprives the defendant of a valuable right, or vitally affects a defensive theory." Allen v. State,
253 S.W.3d 260, 264 (Tex. Crim. App. 2008). Here, our concern is whether the absence of a proper
definition of "murder" in the charge caused the jury to convict Hall of evidence-tampering without
finding an element that the State was required to prove--that she knew Pitonyak had committed a
murder, as that term is defined in the penal code, and not some less culpable form of criminal
homicide. The purpose of the egregious-harm inquiry is to ascertain whether the defendant has
incurred actual harm, not just theoretical harm. Almanza, 686 S.W.2d at 174. This is a "difficult
standard." Ellison v. State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). Our inquiry is factual in
nature and turns on the unique circumstances of this case. See id. Neither Hall nor the State has the
burden to show harm or the lack thereof. See Warner, 245 S.W.3d at 464. Rather, an appellate court
"makes its own assessment" in evaluating what effect, if any, an error had on the jury's verdict by
looking "only to the record before it." Ovalle v. State, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000). 
We are to consider (1) the entire jury charge, (2) the state of the evidence, including the contested
issues and the weight of the probative evidence, (3) the parties' arguments, and (4) any other relevant
information revealed by the record of the trial as a whole. Allen, 253 S.W.3d at 264; Olivas v. State,
202 S.W.3d 137, 144 (Tex. Crim. App. 2006). Harm may be shown by direct evidence or inferred
from the record. See Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

 As Hall emphasizes, nothing in the charge itself required the jury to apply the
penal code's definition of "murder" or otherwise distinguished "murder" from other forms of
criminal homicide. When a statutory term is not defined in the jury charge, we are to assume that the
jury considered the commonly understood meaning of the term in its deliberations. See Olveda
v. State, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983). Citing a single dictionary definition, the
State asserts that the commonly understood meaning of "murder" denotes killing another with
premeditation or malice aforethought, elements not explicitly included in the penal code definition. 
See Webster's New World Dictionary of the American Language 936 (2d College ed. 1976) (murder
is "the unlawful and malicious or premeditated killing of one human being by another; [or] any
killing done while committing some other felony, as rape or robbery"). The State invokes the
principle that where the commonly understood meaning of an undefined statutory term in a jury
charge is more restrictive than the statutory definition, there is no harm from omitting the statutory
definition from the charge because the omission would only operate to the defendant's benefit. See
Olveda, 650 S.W.2d at 409.

 We agree that the term "murder," as commonly understood by laypeople, can
denote intentional homicide, if not also premeditation and malice, as suggested by numerous
dictionaries we have consulted. (16) However, "murder" also has a broader or more colloquial meaning
denoting homicide without legal justification--or, simply, homicide. (17) Depending on which of these
"commonly understood" meanings jurors applied, "murder" might be broader or narrower than the
penal code's definition. Because jurors could, all other things being equal, apply either meaning,
we disagree with the State that Olveda resolves Hall's complaint.

 The trial record, however, reflects that in their statements and arguments before the
jury, both parties equated the term "murder" with intentionally causing death, a definition consistent
with section 19.02(b)(1) of the penal code. In an effort to minimize her involvement, Hall advanced
a primary theory that Pitonyak was "crazy," a "sociopath" or a "beast" who intentionally killed Cave,
dismembered her body, and perhaps even killed her with that plan in mind. During opening
statements, Hall's trial counsel informed the jury that "[t]he evidence is going to show that this was
a deliberate and planned murder. There was nothing accidental about it. . . . [T]his murder was for
no reason at all than to satisfy the whim and caprice of a beast who wanted to see what it would feel
like to kill someone and take that body apart." During closing argument, Hall's counsel returned
to this theme, arguing that Pitonyak "murdered [Cave] for nothing" and urging the jury to infer
his intention to dismember her from evidence of his interest in crime movies with dismemberment
scenes and that his last UT course was "The Human Body." Neither party argued to the jury
that "murder" in the charge meant anything other than intentionally causing death. Hall's
counsel did dispute whether there was evidence Hall knew Pitonyak had been charged with
"intentional murder" before the pair crossed the border (as required to convict her for the felony
hindering-apprehension offense), but neither party questioned before the jury that "murder" meant
intentional murder.

 On appeal, Hall argues that "the lack of powder residue showed a shooting from a
distance," a reference to Dr. Peacock's testimony that the absence of powder residue on Cave's body
indicated that the fatal shot was fired from at least eighteen inches away. Hall apparently suggests
that the jury would have found, based on the distance of the shot, that Hall knew Pitonyak had acted
recklessly or negligently rather than intentionally or knowingly. However, the record also contains
strong evidence from which the jury reasonably could have concluded that Pitonyak shot Cave with
intent to kill her (e.g., his assertions to Sullivan that he had been in a gunfight and his subsequent
efforts to avoid apprehension), and that Hall would have known these facts from the circumstances
of the crime and its aftermath. Hall also asserts that "the State argued it was unknown why Pitonyak
killed Cave." This statement refers to a portion of the State's closing argument in which counsel,
responding to Hall's insinuations that Pitonyak killed Cave to dismember her, merely emphasized
that "we don't have to prove . . . motive," but used the concept that Pitonyak's motive could be
inferred from the evidence to illustrate that the jury could likewise draw inferences regarding Hall's
motives to assist in the dismemberment and flight.

 Having reviewed the trial record, we believe it more plausibly supports the inference
that the jury would have equated "murder" with intentionally causing a person's death, and
that it convicted Hall based on that understanding. We cannot infer from this record that the jury
actually applied a definition of "murder" less demanding than that in the penal code. Consequently,
we conclude that the district court's failure to include the penal code's definition of "murder" in the
charges did not cause Hall egregious harm. We overrule Hall's fourth point of error.


Suppression of evidence

 In her remaining points of error, Hall argues that she is entitled to a new trial on guilt
or at least punishment because the State suppressed evidence of her alleged self-incriminating
statements to Sullivan and impeachment evidence against Langenbach and Conley. A defendant in
a criminal case has no general right to pretrial discovery of evidence in the State's possession. See
Michaelwitz v. State, 186 S.W.3d 601, 612 (Tex. App.--Austin 2006, pet. ref'd). However,
under Brady and its progeny, the United States Supreme Court has recognized "what amounts to
a federal constitutional right to certain minimal discovery." Id. (quoting 42 George E. Dix. &
Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 22.21 (2d ed. 2001)). These
authorities hold that "[t]o protect a criminal defendant's right to a fair trial, the Due Process Clause
of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose
exculpatory and impeachment evidence to the defense that is material to either guilt or punishment,"
Ex parte Reed, 271 S.W.3d 698, ___, 2008 Tex. Crim. App. LEXIS 1569, at *74 (Tex. Crim. App.
Dec. 17, 2008), and that the State's failure to comply with this duty constitutes harm requiring
reversal and a new trial. See Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). On
the other hand, there is no general due process right to advance notice of inculpatory evidence
that the State intends to use against the defendant at trial. See Weatherford v. Bursey, 429 U.S. 545,
559-61 (1977). Additional discovery beyond the Brady minimum may, however, be ordered by
the trial court. See Tex. Code Crim. Proc. Ann. art. 39.14 (West Supp. 2008). Such an order
imposes on the State a continuing duty of disclosure. See Crane v. State, 786 S.W.2d 338, 348
(Tex. Crim. App. 1990).


 Sullivan

 Prior to trial, the district court ordered the State to produce witness statements,
including all written or oral statements purportedly made by Hall concerning the events of the
alleged offenses. See Tex. Code Crim. Proc. Ann art. 39.14(a) (West 2008). In compliance with this
discovery order, the State produced a copy of the reporter's record of the testimony Sullivan had
given in Pitonyak's trial. In that trial, Sullivan gave an account of Pitonyak's 3:00 a.m. visit to
her condo that was similar to the account she subsequently provided in Hall's trial. Sullivan also
testified during Pitonyak's trial, similar to Hall's trial, that she had visited Pitonyak in jail "maybe
like five" times, that Hall had sought her out through her Facebook page "because she had heard
that I was visiting or had visited Colton at the jail," and that she had allowed Hall to accompany
her on one of those visits. However, in contrast to her later testimony in Hall's trial, Sullivan
made no claim during Pitonyak's trial that Hall had made any statements to her regarding Cave's
dismemberment, much less any admissions implicating herself in such acts. The State did not
divulge the existence of any statements by Hall to Sullivan implicating herself in the dismemberment
until Sullivan was already on the stand testifying in Hall's trial. There is no dispute that the State
had prior knowledge of the alleged statements and intended to elicit Sullivan's testimony about them,
yet did not disclose their existence to Hall as the discovery order required.

 Over the objections of Hall's trial counsel, and after a one-day postponement of
Sullivan's testimony in an attempt to cure any unfair surprise, the district court permitted the State
to elicit Sullivan's testimony about Hall's alleged self-incriminating statements to her. In her fifth
point of error, Hall argues that the district court abused its discretion in admitting Sullivan's
testimony and in overruling the same complaint in Hall's new trial motion. Hall asserts that the
record establishes that the State wilfully failed or refused to disclose the statements as required
by the discovery order. She relies on the rule that evidence wilfully withheld from disclosure under
a discovery order should be excluded from evidence. See Oprean v. State, 201 S.W.3d 724, 726
(Tex. Crim. App. 2006) (stating that "[e]vidence wilfully withheld from disclosure under a discovery
order should be excluded from evidence" and holding that admission of such evidence was an abuse
of discretion) (citing Hollowell v. State, 571 S.W.2d 179, 180 (Tex. Crim. App. 1978)); see also
Osbourn v. State, 59 S.W.3d 809, 816 (Tex. App.--Austin 2001) ("the extreme sanction of exclusion
should not be imposed absent wilfulness on the part of the prosecution."), aff'd, 92 S.W.3d 531
(Tex. Crim. App. 2002). (18) "Wilfulness" denotes that the prosecutor "acted with the specific intent
to wilfully violate the discovery order," "made a conscious decision to violate the plain directive
of the discovery order," or violated the order in a "calculated effort to frustrate the defense." See
Oprean, 201 S.W.3d at 727-28.

 Hall further argues that she was harmed by the admission of Sullivan's testimony
about the statements. Even if the district court abused its discretion in admitting the testimony in
the face of a wilful discovery order violation, Hall still had the burden of demonstrating harm to
obtain reversal on appeal. See Cooks v. State, 844 S.W.2d 697, 734 n.31 (Tex. Crim. App. 1992),
cert. denied, 509 U.S. 927 (1993); Hollowell, 571 S.W.2d at 180. Because Hall's complaint is based
on the discovery order violation rather than the substantive inadmissibility of the statements, the
harm we review is that caused by the State's failure to disclose the statements as required by
the discovery order. See Cooks, 844 S.W.2d at 734 n.32; Oprean v. State, 238 S.W.3d 412, 415
(Tex. App.-Houston [1st Dist.] 2007, pet. ref'd) (op. on remand). "In so doing, we take into
consideration the intended purpose of the discovery order: to prevent surprise and to permit
appellant to prepare an adequate defense." Oprean, 238 S.W.3d at 415.

 The State concedes that it violated the discovery order in failing to disclose Hall's
statements to Sullivan. Nevertheless, it maintains that the district court did not abuse its discretion
in admitting the testimony because the record demonstrates its violation was not wilful. The State
further asserts there is no harm from any wilful discovery order violation because the district court
took measures to mitigate any unfair surprise or prejudice.

 As with other rulings admitting or excluding evidence, we review the district court's
decision to admit Sullivan's testimony under an abuse-of-discretion standard of review. Id. at 726.
We also review the court's ruling on Hall's motion for new trial under the same standard. See
Holden v. State, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). Under this standard, an appellate
court should uphold a trial judge's ruling unless it is outside the "zone of reasonable disagreement." 
Oprean, 201 S.W.3d at 726. We afford "almost total deference" to any explicit written or oral fact
findings by the district court "based on an evaluation of credibility and demeanor." Id. (quoting
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). In the absence of such findings, we
"view the evidence in the light most favorable to the trial court's ruling and assume that the
trial court made implicit findings of fact that support its ruling as long as those findings are
supported by the record." Id. (quoting State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). 
Hall's appellate contentions, in substance, are challenges to the district court's findings (whether
express or implied) that the State did not violate the discovery order wilfully and its failure to find
harm. We accordingly evaluate the record support for those findings.

 Sullivan was initially called to testify during the morning of the first day of Hall's
trial. After Sullivan testified that Hall had asked to accompany her on one of her visits to Pitonyak
in jail, Hall's counsel asked to approach. A bench conference ensued in which the State revealed
for the first time that Sullivan "has had discussions with Laura Hall regarding her involvement in
the case, but they are not in any statements" it had previously produced pursuant to the discovery
order. The State further indicated that Sullivan "informed us of this when we were discussing her
coming here for this trial." Hall's counsel vigorously objected to Sullivan testifying about alleged
admissions or statements by his client that the State had not produced as required by the discovery
order. The district court recessed the trial and held a hearing out of the jury's presence to determine
the nature of the statements in question and when the State had obtained them.

 During the hearing, Sullivan testified that the first time she had discussed Hall's
statements with prosecutors "would have been about last week on the phone." The record reflects
that Sullivan was testifying on a Tuesday. The district court ordered that Sullivan's testimony would
not be permitted "until I have had further information" and Hall's counsel had "an opportunity to
talk to the witness before any further direct or cross-examination on this particular issue." (19) Trial
proceeded with the State calling other witnesses.

 Later, during the lunch recess that day, the record reflects that the district court
instructed a reluctant Sullivan to submit to an interview with Hall's counsel. The court also required
the State to produce notes that its second-chair prosecutor had made during two pretrial interviews
with Sullivan. The prosecutor represented to the district court that her first interview had been "last
week," though she did "not know exactly what date that was," and that the other was "yesterday." 
Following the recess, Hall's counsel represented that Sullivan had told him she had revealed the
statements to the State not later than Monday or Tuesday of the preceding week. Hall's counsel
urged again that evidence of the statements should be excluded because the State had violated the
discovery order. Counsel also urged that he had been unfairly surprised by Sullivan's sudden
transformation from an innocuous background witness into one of the State's primary champions
implicating Hall in the charged offenses.

 The State's lead prosecutor apologized for the discovery order violation, but
represented to the district court that "it was certainly not an intentional act." He suggested that the
State's trial team had inadvertently overlooked its duty to disclose the statements during the "hectic
few days" leading up to trial. The State further urged that any harm from its violation "was cured
by the opportunity for [Hall's counsel] to visit with the witness." The district court took the matter
under advisement and trial continued.

 Following the testimony of the afternoon's first witness, the record reflects that Hall's
counsel tendered a handwritten motion for continuance to the district court. The motion itself is not
in the appellate record, although the district court and the parties discuss some of its contents on the
record. From this record, it appears that the continuance motion was conditioned on the district
court's denial of Hall's motion to exclude Sullivan's testimony. (20)

 During a subsequent recess that day, the district court returned to the issue of
Sullivan's testimony. It stated on the record that Hall's counsel "has had an opportunity to discuss
her testimony and further inquiry to see what she has to say," that "the record has been made as to
when the State actually acquired this information," and that a discovery order had been in place. The
court also observed that Hall had filed a motion for continuance and stated that "part of the motion
asks for . . . an opportunity to interview the witness. That has been granted." The court emphasized
that the statements in question were "[n]ot Brady" but "non-exculpatory and non-mitigating," and
suggested that Hall presumably would be aware of any such statements she had made and could
assist her counsel with that information. The district court then stated, "I do not find that the State
withheld these in bad faith or wilfully in any way to infringe upon the defendant's right to have
adequate defense."

 The district court then denied Hall's motion to exclude Sullivan's testimony "as of
now." "[I]n an abundance of caution," however, the court postponed any further testimony from
Sullivan until the following day so as to afford Hall "further opportunity to investigate any other
matters with regard to this witness." The court suggested that it might revisit its rulings if "anything
further is presented" regarding Sullivan's testimony.

 Hall did not raise any additional objections regarding Sullivan's testimony before
it resumed on the following afternoon. Nor did Hall obtain any further rulings on her continuance
motion or seek additional delay.

 When Hall re-urged her complaint regarding the admission of Sullivan's testimony
in her motion for new trial, (21) her trial counsel submitted an affidavit in which he detailed differences
in trial strategy and additional investigation he would have pursued to impeach Sullivan and
demonstrate that she had fabricated her account of Hall's admissions. Specifically, counsel
presented evidence that he would have obtained: (1) testimony from Pitonyak's trial counsel that
Sullivan had not mentioned Hall's admissions during a pre-trial interview; (2) testimony from
witnesses who claim they saw Sullivan, who had been attending Pitonyak's trial, cry when the
verdict was announced; (3) the phone records of any calls Hall and Sullivan had with each other;
and (4) jail records showing that Sullivan continued to visit Pitonyak in the county jail until
May 2007--three months before Hall's trial--when he was transported to prison.

 The State tendered an affidavit from its second-chair prosecutor explaining the
circumstances in which she had obtained the statements from Sullivan. The prosecutor recounted
that the prosecution team met with and interviewed Sullivan before Pitonyak's trial, but "we did not
discuss Laura Hall with her at any time that I can recall." During the weeks prior to Hall's trial, the
prosecutor claimed she had difficulty reaching Sullivan, who had moved to California, and had to
subpoena her to testify. The prosecutor testified that she traded several messages and had "two or
three" brief conversations with Sullivan before they "finally had a longer conversation that included
working out personal service, travel arrangements and a discussion of the Laura [H]all case."
Regarding the timing of this conversation, the prosecutor acknowledged, "I believe this was a week
or so prior to trial."

 Following this call, according to the prosecutor, Sullivan was finally served with
process on the Thursday or Friday before trial, and flew to Austin on the Sunday before trial. She
"believe[d] that we first met in person regarding the Laura Hall case" at 8 a.m. on Tuesday, the first
day of trial. During this meeting, they "discussed all questions we anticipated asking at trial and
when she would be testifying." (22) The prosecutor added that, as reflected in the trial record, "I took
notes from our telephone discussion and face to face meeting." She further averred that these notes
were "immediately" disclosed "[o]nce the question arose as to whether the State was required
to disclose the statements." However, the prosecutor's affidavit is silent as to any explanation for
the State's failure to disclose the statements at any of the earlier junctures at which the record
reflects the State possessed some version of the statements--following the phone conversation with
Sullivan the preceding week, following the Tuesday morning meeting, or during the State's pretrial
preparations to examine Sullivan about those very statements.

 In denying Hall's new trial motion, the district court made the following written
findings of fact pertinent to Sullivan's testimony:


16. Nora Sullivan testified for the State that the Defendant had made
incriminating comments to Sullivan prior to trial;


17. The State's counsel knew Sullivan claimed the Defendant made these
statements but did not disclose those statements to the defense prior to trial;


18. When Sullivan began to testify to the non-disclosed statements, a recess was
called to permit defense counsel to interview Sullivan about these statements;


19. Defense counsel was permitted to interview Sullivan before she was recalled
to testify.

Although the district court had stated an oral finding regarding the State's wilfulness during trial,
it made no explicit finding on that issue in connection with Hall's new trial motion.

 The trial record reflects that the State had come to trial prepared to examine Sullivan
about the statements; the statements' existence was not a sudden revelation to the State while
Sullivan was on the witness stand. In fact, the State's second-chair prosecutor took notes reflecting
these statements during a phone conversation with Sullivan that, she admitted, occurred "a week or
so prior to trial." She also acknowledged that the statements were discussed again during a face-to-face meeting with Sullivan at 8 a.m. on the first morning of trial. The State did not call Sullivan
to testify that day until after opening statements and four other witnesses had testified. There is no
suggestion that the State was unaware of the discovery order. Nonetheless, the State did not disclose
the statements until after it was already beginning to elicit Sullivan's testimony about them--and
then only after Hall's trial counsel inquired whether the State's line of inquiry was delving into
statements it had not disclosed under the discovery order.

 The State asserts that its failure to disclose the statements was "an oversight
attributable to the fact that the information was not received until the hectic week before trial," as
the first-chair prosecutor had suggested at trial, adding that the district court (at least at trial) had
explicitly found the non-disclosure not to be wilful or in bad faith. (23) It further urges us to infer that
Sullivan's statements were not fully "fleshed out" until the face-to-face meeting at 8 a.m. on the first
morning of trial. It nonetheless remains that the State offers no explanation for its failure thereafter
to disclose the statements before putting Sullivan on the stand later that morning and attempting
to elicit those statements from her. This record establishes that the State acted wilfully in failing to
disclose the statements at least after its 8 a.m. meeting with Sullivan, if not earlier. See Oprean,
201 S.W.3d at 727-28.

 To establish that the district court's admission of Sullivan's testimony is reversible,
however, Hall had the burden of showing harm. See Cooks, 844 S.W.2d at 734 n.31; Hollowell,
571 S.W.2d at 180. Specifically, Hall had to demonstrate that the State's failure to disclose
the statements upon learning of them--which occurred about one week before trial, at the
earliest--unfairly surprised her and prevented her from presenting an adequate defense. See Oprean,
238 S.W.3d at 415. On this record, Hall cannot make this showing. because she has failed
to preserve any complaint that any unfair surprise or prejudice remained after the one-day
postponement the district court provided.

 As previously explained, the reporter's record reflects that Hall filed a handwritten
motion for continuance, but the motion itself does not appear in the appellate record. The sole
indication of the specific relief Hall requested in her motion, and the sole ruling on the motion that
is reflected in the record, is the district court's statement during the first afternoon of trial that it had
granted a part of the motion by postponing Sullivan's testimony for a day to afford Hall's counsel
the opportunity to interview the witness. The district court emphasized that it would revisit its
rulings regarding Sullivan's testimony if "anything further is presented" after Hall's counsel had
"further opportunity to investigate any other matters with regard to this witness." Thereafter, Hall
did not object or complain that the one-day postponement the district court had provided was
insufficient to cure any unfair surprise or prejudice caused by the State's discovery order violation. 
In short, there is no indication in the appellate record that Hall requested or was denied any
delay greater than that which the district court afforded her. Consequently, Hall cannot show harm
from the admission of Sullivan's testimony. See Lindley v. State, 635 S.W.2d 541, 544 (Tex. Crim.
App. 1982) (failure to request a continuance waives error on the basis of surprise or violation of a
discovery order). (24)

 Absent a showing of harm, we cannot hold that any abuse of discretion in admitting
Sullivan's testimony was reversible error. We overrule Hall's fifth point of error.


 Langenbach

 In her remaining two points of error, Hall asserts that the State failed to disclose
impeachment evidence as required under Brady and that the district court, consequently, abused its
discretion in overruling these grounds in her motion for new trial. With regard to Langenbach, Hall
complains that the State failed to produce information in its possession that the witness had been
convicted in New Zealand on a count of kidnaping and two counts of "uttering," a crime similar to
forgery, and had been charged in Travis County with tampering with a government record for lying
about her New Zealand convictions on a Texas real estate license application.

 To establish a due process violation under Brady, a defendant must show that: (1) the
State failed to disclose evidence in its possession; (2) the withheld evidence is favorable to the
defendant; and (3) the evidence is "material," that is, there is a reasonable probability that had
the evidence been disclosed, the outcome of the trial would have been different. Webb v. State,
232 S.W.3d 109, 114 (Tex. Crim. App. 2007) (citing Hampton, 86 S.W.3d at 612). The evidence
may be material to either guilt or punishment. Brady, 373 U.S. at 87. Evidence that could be used
effectively to impeach a prosecution witness, including prior convictions, is evidence favorable to
the defendant for Brady purposes. See United States v. Bagley, 473 U.S. 667, 676 (1985); Arroyo
v. State, 117 S.W.3d 795, 798 n.1 (Tex. Crim. App. 2003). The State's duty to disclose such
evidence applies "irrespective of the good faith or bad faith of the prosecution," Brady, 373 U.S.
at 87, and regardless of whether the defendant has previously requested it. Harm v. State,
183 S.W.3d 403, 406 (Tex. Crim. App. 2006). (25)

 There is no dispute that the undisclosed information about Langenbach's prior
convictions was favorable evidence for Brady purposes. See Bagley, 473 U.S. at 676; Arroyo,
117 S.W.3d at 798 n.1. Nor, in our view, is there a serious question that the State had possession
of this information. The State stipulated that the information had been contained in the
Travis County District Attorney's files regarding the three Travis County offenses on which
Langenbach was being held when she shared a cell with Hall. However, it claimed that the
prosecutors in the Hall case were unaware of the files in the Langenbach case, and the district court
so found. (26) Although the State did not dispute in its pre-submission briefing that it possessed the
information for Brady purposes and had a potential duty to disclose it, it contended during oral
argument and in a post-submission letter that "it no longer believes that it had such a duty because
the prosecution team did not have knowledge of those convictions." The State suggests that because
Langenbach's prosecution was "handled by a different section of [the] prosecutor's office, clearly
not part of the prosecution team" in Hall's case, the Hall prosecution team had no duty to disclose
Brady information contained in the office's files concerning the unrelated Langenbach proceedings. 
The State attempts to rely on the concept of a "prosecution team" that has developed in the case law
to define the universe of prosecutors and investigators extending beyond the prosecutor's office
whose knowledge of Brady material should be imputed to the prosecutor. See Kyles v. Whitley, 514
U.S. 419, 437 (1995) (prosecutors must not only disclose information within their own personal
knowledge, but "have a duty to learn of any evidence favorable to the defense that is known to others
acting on the government's behalf in the case, including the police."); State v. Moore, 240 S.W.3d
324, 328 (Tex. App.--Austin 2007, pet. ref'd) (distinguishing Texas Attorney General's Office from
"prosecution team" of police, investigating agencies, and other agencies "closely aligned with the
prosecution"). The State urges us to apply this "prosecution team" concept within the single agency
of the Travis County District Attorney, suggesting that it was required to disclose only the Brady
materials known to the office employees personally involved in the Hall prosecution. We find no
support for the State's position. See Ex parte Richardson, 70 S.W.3d 865, 871-73 (Tex. Crim. App.
2002) (duty under Brady applied despite prosecutor's lack of personal knowledge of favorable
information in office files); see also Giglio v. United States, 405 U.S. 150, 154 (1972) (recognizing
that a prosecutor's office is an "entity" and that information in the possession of one attorney in the
office "must be attributed" to the office as a whole) (citing Restatement (Second) of Agency § 272
(1958)); Moore, 240 S.W.3d at 328 ("The duty to disclose under Brady arose only if the prosecutors
or other members of the 'prosecuting team' knew of the investigation or had access to the
information").

 Whether the State's failure to disclose the impeachment evidence constituted a due
process violation turns instead on whether the evidence was "material" under Brady. Undisclosed
evidence is "material" to guilt or punishment "only if there is a reasonable probability that, had
the evidence been disclosed to the defense, the result of the proceeding would have been different."
Bagley, 473 U.S. at 682. A "reasonable probability" is "a probability sufficient to undermine
confidence in the outcome." Id. In other words, "[t]he question is not whether the defendant would
more likely than not have received a different verdict with the evidence, but whether in its absence
he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles,
514 U.S. at 434. The Supreme Court has further explained that this standard "is not a sufficiency
of the evidence test"--"[a] defendant need not demonstrate that, after discounting the inculpatory
evidence in light of the undisclosed evidence, there would not have been enough left to convict." 
Id. at 434-35. Instead, the defendant must "show[] that the favorable evidence could reasonably be
taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.
at 435. On the other hand, "[t]he mere possibility that an item of undisclosed information might
have helped the defense, or might have affected the outcome of the trial, does not establish
'materiality' in the constitutional sense." Hampton, 86 S.W.3d at 612 (quoting United States
v. Agurs, 427 U.S. 97, 109 (1976)); see also id. (distinguishing this standard from the general
standard for constitutional harmless error). The inquiry "involves balancing the strength of
the [favorable] evidence against the evidence supporting conviction." Hampton, 86 S.W.3d at 613. 
We must accordingly consider "the entire body of evidence" at trial. Id. Similarly, we evaluate
materiality "in terms of suppressed evidence considered collectively, not item-by-item." Kyles,
514 U.S. at 436. We consider the evidence in the light most favorable to the district court's ruling
that the State's failure to disclose the additional criminal history information did not violate Hall's
due process rights. See Webb, 223 S.W.3d at 115.

 Our analysis of the undisclosed impeachment evidence's materiality begins with the
fact that the State did disclose Langenbach's Travis County convictions and that Hall's trial counsel
was able to utilize this evidence in an effective cross-examination. Prior to trial, the State provided
Hall a "Notice of Witnesses' Criminal History" disclosing that Langenbach had three Travis County
felony convictions, all dated October 17, 2005: (1) securing execution of document by deception,
for which she was sentenced to two years in state jail, probated for a term of five years;
(2) misappropriation of property by a fiduciary, for which she was sentenced to ten years in prison,
probated for a term of ten years; and (3) another count of securing execution of a document by
deception, for which she was sentenced to two years in state jail, probated for a term of five years. 
During her direct examination, Langenbach acknowledged that she was currently on felony probation
related to charges of securing execution of a document by deception and was being held on these
charges when she shared a jail cell with Hall. Hall's trial counsel began his cross-examination of
Langenbach by inquiring whether she had previously been to prison for any other conviction. 
Langenbach responded, "Yes, sir." The following exchange ensued:


Q: And where was it, ma'am?


A: In New Zealand.


Q: For what offense?


 A: I tried to help a friend adopt a baby and in order to get the baby to the United 
States, she needed an American passport for the baby and I went with her to
the American embassy.


Q: And you were convicted of trying to--fraudulently trying to obtain a
passport?


A: No, of helping my friend adopt a baby.


Q: Is the adoption of a child a crime in New Zealand?


A: Because it wasn't executed in New Zealand.



Hall's counsel then proceeded to question Langenbach about her Travis County convictions, eliciting
her acknowledgment that each crime involved her deceiving and harming others for her own
benefit. (27) For example, Langenbach responded in the affirmative to counsel's question, "In each
instance you stole something or swindled somebody, cheated somebody into signing things for
you; is that right?" Counsel did not return to Langenbach's New Zealand convictions other than to
elicit her affirmative response to the following question regarding her Travis County convictions: 
"So, similar to the charge that you had been in prison for in New Zealand, you were deceiving
somebody?"

 With this evidence of past criminal convictions involving fraudulent and dishonest
conduct before the jury, Hall's counsel attempted to raise the inference that Langenbach had utilized
facts about the crime she had heard in media reports to weave a false account that she could trade
to authorities in exchange for favorable treatment. He elicited Langenbach's admissions that she
knew the meaning of the term "jailhouse snitch" (as Hall's counsel described one, "somebody who
gathers information on someone, supplies it to police authorities in exchange for some form
of favorable treatment"), and that Langenbach had recognized Hall from television. Langenbach
insisted that her account was based solely on Hall's statements to her and denied receiving any
favorable treatment in exchange for her testimony.

 Even without the additional impeachment evidence the State withheld, Langenbach's
cross-examination based on her three Travis County convictions seriously damaged her credibility,
informing the jury that she had a history and propensity to lie, cheat and scheme--to an extent of
committing felony criminal offenses--to advance her own interests at others' expense. Evidence
of the New Zealand convictions, of course, would have informed the jury that Langenbach had more
convictions for this sort of misconduct and that her misconduct dated back to at least 1996. 
Nonetheless, the central fact that she had a history and pattern of such conduct was already before
the jury. Similarly, Hall asserts that because the additional prior convictions would have increased
Langenbach's likelihood of going to prison (and, at her age, dying there), they would have tended
to establish greater incentives for her to lie to curry favor with authorities. But the jury already knew
the key fact that Langenbach, with three pending felony charges, had strong incentives to be a
"jailhouse snitch." Hall also complains that the additional impeachment information would have
enabled her to better attack Langenbach's attempt to downplay her New Zealand offenses as a single
incident of "helping my friend adopt a baby." However, the jury reasonably could have concluded
that this assertion further undermined Langenbach's credibility, as she quickly acknowledged that
adopting a baby was not a crime in New Zealand and that whatever offense or offenses she had
committed actually had involved deceitful conduct similar to her Travis County offenses.

 We must also consider the materiality of the undisclosed impeachment evidence
in light of the role or importance of Langenbach's testimony in supporting Hall's convictions. To
obtain its conviction against Hall for the lesser-included misdemeanor offense of hindering
apprehension, the State was required to prove beyond a reasonable doubt that Hall, "with intent to
hinder the arrest, prosecution, conviction, or punishment for Colton Pitonyak for the offense of
murder," either (1) "harbor[ed] or conceal[ed] Colton Pitonyak" or (2) "assisted Colton Pitonyak in
his flight from the State of Texas and provided transportation to Colton Pitonyak in his flight
from the State of Texas." There was overwhelming evidence that Hall voluntarily supplied her
own vehicle for use in transporting Pitonyak across the Mexican border and drove the car herself. (28) 
The State also presented strong evidence, apart from Langenbach's testimony, tending to establish
that Hall took these actions with knowledge of Cave's murder and intent to hinder Pitonyak's
apprehension for the crime. Cell phone records demonstrated repeated contacts between Hall
and Pitonyak during the early morning of August 17, and Martindill's testimony placed Hall
at the condo later that morning. Said Aziz testified that Hall admitted, "I have been up in this shit
since two hours after it started." Aziz added that Hall told him, with regard to their apprehension
by Mexican police, "I can't believe they found us so fast," a statement implying an
awareness that authorities would be searching for them. Aziz similarly recounted that he "asked
Hall why she would want to help somebody who killed a girl very much like herself, to which
she replied that she loves him and, quote, 'that's just how she rolls.'" The State also presented DNA
evidence showing high probabilities that Hall had been in the condo during the day and--as reflected
by her probability of exclusion as a contributor to DNA found on the shop towel--after Pitonyak's
mid-afternoon trip to the hardware store. Further informing the inferences of guilt the jury
reasonably could draw from this evidence, it heard considerable evidence that Hall was highly
motivated to protect Pitonyak and seek his favor, despite his involvement in a murder and even if
it meant breaking the law. (29)

 Langenbach's testimony had greater relative importance in supporting Hall's
conviction for tampering with physical evidence. To secure this conviction, the State was required
to prove, beyond a reasonable doubt, that (1) Hall, "either acting alone or with another as a party to
the offense," (2) "knowing that an offense, to wit: a murder, had been committed," (3) "alter[ed] or
destroy[ed] or conceal[ed] a thing, to wit, a human body or biological evidence," (30) (4) "with intent
to impair its verity or availability as evidence in any subsequent investigation of or original
proceeding related to the offense." The district court instructed the jury on the law of parties: "[a]
person is criminally responsible as a party to an offense if the offense is committed by his own
conduct, by the conduct of another for which he is criminally responsible, or by both," and that "[a]
person is criminally responsible for an offense committed by the conduct of another if acting with
intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or
attempts to aid the other person to commit the offense."

 As noted, there was strong evidence that Hall was physically present in Pitonyak's
condo both before and after his trip to the hardware store, that she knew he had murdered Cave,
that she was highly motivated to protect Pitonyak, and that she helped him flee to Mexico later
that evening. However, there was little, if any, physical evidence connecting Hall directly to the
dismemberment of Cave's body. Hall was excluded as a contributor to DNA found on the hacksaw,
knives, machete, dust masks, and every other item found in the condo other than a blue shop towel
from the living room and the flip-flops found in the bathroom. DNA evidence on Pitonyak's
handgun did show a high probability that Hall had contacted the item at some point. However, the
State's expert Carridine acknowledged that the mere fact one's DNA appeared on an item did not
establish when the person made contact, where they made contact, or what they were doing. (31) There
was also evidence that Hall had gassed up and washed her car while Pitonyak was buying a hacksaw
and other supplies at the hardware store. While perhaps probative of Hall's plan to help in the
escape to Mexico, it does not necessarily show her involvement in dismembering Cave's body.

 The State's case against Hall for evidence-tampering ultimately rested upon evidence
of Hall's alleged after-the-fact admissions. We have held that the district court did not commit
reversible error in admitting Nora Sullivan's testimony about Hall's purported admissions to her. 
Sullivan squarely implicated Hall as a party to the offense, testifying that Hall admitted she "tried
to motivate" Pitonyak "to get him to do it . . . to convince and get him moving" in "his task" of
dismembering Cave's body. This testimony further informed the inferences that the jury drew from
Hall's admission to Aziz that "I have been up in this shit since two hours after it started," and the
impact of Rosalez's testimony that Hall admitted "she had helped [in some unspecified way] and
then masterminded the escape to Mexico."

 Langenbach, to be sure, provided the most detailed account of events in Pitonyak's
condo on August 17, and was the only witness squarely implicating Hall in personally cutting on
Cave's body. (Sullivan could testify to no more than her "impression" that Hall had directly
participated). Nonetheless, balancing the strength of the impeachment evidence withheld by
the State with the impeachment evidence already before the jury and the strength of the State's case,
see Hampton, 86 S.W.3d at 613, we conclude that the withheld impeachment evidence does not rise
to the level of material in the constitutional sense. The State's case against Hall for misdemeanor
hindering apprehension was very strong. While its case for evidence-tampering was less so, there
was sufficient evidence to convict Hall, at least as a party, in light of Sullivan's testimony and the
inferences it enabled the jury to draw from other evidence. Although the test for materiality does
not turn on whether sufficient evidence remains to support the verdict if we ignore Langenbach's
testimony, see Kyles, 514 U.S. at 434-35, we do balance the strength of this evidence against that
of the undisclosed evidence to determine whether the latter would have placed the State's whole case
as to either conviction in such a different light as to undermine our confidence in the jury's verdict
and constitute a reasonable probability of a different outcome. See id.; Hampton, 86 S.W.3d at 613. 
In light of the impeachment evidence already before the jury, we cannot conclude that it would have. 
Compare Webb, 232 S.W.3d at 115 (in prosecution for sexual assault of a child, possibility that
victim would file civil suit against defendant was not material "[i]n light of all the evidence
presented against Appellant and the abundant impeachment evidence Appellant offered against
the complainant"); Saldivar v. State, 980 S.W.2d 475, 486 (Tex. App.--Houston [14th Dist.] 1998,
pet. ref'd) (undisclosed theft conviction was not material where witness's inconsistent statements
permitted effective cross-examination, State's case was "strong," and witness's testimony was
cumulative of other witnesses); with Ex parte Richardson, 70 S.W.3d 865, 871-73 (Tex. Crim. App.
2002) ("Applicant's trial counsel did impeach Ms. Hanson's testimony in other ways, but nothing
presented at trial . . . could compare with a parade of six law enforcement officers testifying that, in
their opinion, Ms. Hanson was not a credible witness"). While the additional impeachment possibly
"might have helped the defense, or might have affected the outcome of the trial" in regard to guilt-innocence, this "does not establish 'materiality' in the constitutional sense." Hampton, 86 S.W.3d
at 612 (quoting Agurs, 427 U.S. at 109). To this extent, we overrule Hall's sixth point of error. We
will address the implications of Langenbach's undisclosed convictions for Hall's punishment in
the next section.


 Conley

 In her seventh point of error, Hall argues that the district court abused its discretion
in denying her a new punishment trial because the State violated Brady in suppressing impeachment
evidence relating to Douglas Conley. Conley was the cab driver who was the State's sole witness
during the punishment phase. He claimed that Hall, while riding in his cab, had referred to the
murdered and decapitated Cave as "some bitch" and exhibited a demeanor toward the victim that
Conley described as "just cold, callous."

 Following trial, Conley contacted Hall's counsel and claimed that he had been
unable to identify Hall in a photo line-up during his initial meeting with Austin police after reporting
"Ashley's" alleged statements. He later supplied an affidavit in which he testified to these facts.
Conley further asserted that he had raised the issue with prosecutors when meeting with them
before testifying in Hall's trial. In response to his inquiry about the line-up, according to Conley,
prosecutors showed him a single 8" x 10" photo to confirm Hall's identity and "told [him] not
to worry about it." (32)

 In response, the State stipulated that, indeed, Conley had been unable to identify
Hall's photo from the line-up. It also presented affidavit testimony from both the lead and second-chair prosecutor admitting that Conley, during a pre-trial meeting, had asked them about his previous
difficulties in identifying Hall in the line-up. Their description of this conversation differed
somewhat from Conley's version. Both prosecutors claimed that Conley had insisted that the woman
in his cab was Hall. When asked how he knew, according to the prosecutors, Conley assured them
he had seen Hall in media coverage on the case and could tell "Ashley" was Hall. The State also
emphasized to the district court that Conley had identified Hall at trial as the woman in his cab, and
that facts Conley testified "Ashley" told him corresponded to the evidence about Hall (e.g., the
pending felony charge involving aiding a boyfriend accused of murder, and Rosalez's testimony
that Hall had worked at Baby Acapulco's on Barton Springs Road that summer). The State presented
further corroborating proof that there had been only five felony hindering-apprehension cases
pending against white females in Travis County when Conley picked up "Ashley," one of which
was against Hall.

 In denying Hall's motion, the district court found that Conley had testified for the
State "attributing disparaging statements about the victim to the defendant," that Conley had been
shown a photo line-up and "was unable to identify the defendant from that photo line-up," that
prosecutors had possession of that information from a report prepared by the police detective who
had interviewed Conley and Conley's own inquiries, that "the defense team was not informed of the
failure of Mr. Conley to identify Ms. Hall from the photo array prior to trial," and that there was no
testimony concerning Conley's failure to identify Hall at trial. However, the court also found that
"[t]here were additional identifying factors in Mr. Conley's narrative that supported the identification
despite Conley's inability to identify the defendant from the photo line up."

 There is no dispute that Conley's failure to identify Hall in a photo line-up and the
prosecutor's subsequent actions to confirm her identity with Conley were impeachment evidence in
the State's possession that it did not disclose to Hall. The parties join issue, however, as to whether
this undisclosed evidence was material under Brady.

 Unlike the largely cumulative impeachment evidence the State withheld regarding 
Langenbach, there was no other impeachment evidence before the jury about Conley. We also must
agree with Hall that evidence Conley had been unable to identify Hall in a photo line-up during
his first meeting with police--and that prosecutors had subsequently wood-shedded him before
trial by showing him a single photo of Hall--would have been very powerful impeachment. Used
effectively, this evidence could raise strong inferences that Conley, for whatever reason, had
fabricated his account, or was at least mistaken. (33) We are unpersuaded by the State's arguments that
this potential impact was effectively "cured" by Conley's in-court identification of Hall, as the jury
would also have heard that Conley had been wood-shedded with the aid of Hall's photograph. Nor
do we believe the State's corroborating proof resolves the problem, as the record reflects that many
of these facts about Hall had been widely publicized in media reports about the case. (34) Conley, as
noted, admitted that he had followed the news coverage on the case.

 The State suggests that Conley's testimony was merely cumulative of guilt-innocence
evidence to the effect that Hall was "cold" and "callous" regarding Cave's fate. The State
emphasizes Langenbach's testimony that Hall articulated such shocking thoughts as wondering what
"the big fuss was about" because Cave "was nothing. She was nobody. Colton had a full paid
scholarship and Jennifer was just a waitress," and bragging, "How many grandmothers can tell their
grandchildren that they cut up a body?" It also refers to Rosalez's testimony that Hall had termed
Cave's murder and dismemberment a "victimless crime," Aziz's account of Hall's "'that's just
how she rolls'" comment, and the content of Hall's Facebook page. And, lest we overlook the
obvious, the jury did convict Hall of participating, at least as a party, in a gruesome decapitation and
dismemberment of a murder victim.

 Nevertheless, Conley played a uniquely critical role in regard to punishment. He
was the State's sole witness during the punishment phase, and his testimony was clearly calculated
to shock and disgust the jury one last time before it began its punishment deliberations. More
importantly, Conley was the State's primary witness establishing that Hall's "cold" and "callous"
view of her crimes had persisted despite the passage of time. While Aziz and Langenbach testified
to statements Hall made shortly after her return from Mexico, Conley testified to statements she
allegedly made over a year afterward. The State emphasized this temporal relationship during its
final closing argument on punishment, in which it urged the jury that Hall had evidenced a persisting
lack of remorse confirming that she was beyond rehabilitation. The State argued:


You can consider her words to Doug Conley in August of 2006, a year after Jennifer
Cave was killed. He just killed some bitch. That's a lack of remorse and you can
hold that against her. You cannot fathom someone who having seen what she saw
did, what she did a year later, treat her like she never lived. That is a lack of remorse
that you absolutely can consider.



After this statement, the State added, "The words she said to Javier Rosalez at very close in time
and same place. Her lack of remorse shows you that she cannot be rehabilitated." It concluded by
urging the jury, "There is no course of action you have but to send her to prison for the maximum
sentence because of the mind that is on her shoulders. There is no one of you who I believe will take
the risk of letting her out with anything less than the maximum sentence."

 Although Rosalez did testify that Hall uttered her "victimless crime" statement in
roughly the same time frame as her statements to Conley, he, unlike Conley, had been impeached
with proof of two prior felony convictions. Furthermore, Langenbach, who provided the State's
most graphic and sensational testimony attributing to Hall a callousness and lack of remorse, had
also been solidly impeached. For these reasons, Conley's testimony would tend to have greater
probative value relative to these witnesses. Alternatively, to the extent the jury would have afforded
much weight to Langenbach's testimony, it becomes significant that the State also withheld
additional impeachment evidence on her. Although we concluded that this evidence was ultimately
not material to Hall's guilt, we must consider it in conjunction with the suppressed impeachment
evidence on Conley when evaluating the materiality of both in regard to punishment. See Kyles,
514 U.S. at 434-35 (we evaluate materiality "in terms of suppressed evidence considered
collectively, not item-by-item.").

 The record also reflects that, even on the state of the evidence presented at trial,
the jury gave more than mere passing consideration to granting Hall probation on her evidence-tampering conviction. During its punishment deliberations, the jury sent out notes inquiring whether
it could impose imprisonment for Hall's hindering-apprehension conviction and probation for
evidence-tampering. It also inquired whether, if it granted probation, it had any control over the
conditions of Hall's supervision.

 On this record, we must conclude that the suppressed impeachment evidence
against Conley was material--had it been disclosed and used effectively, it would have placed
the State's punishment case in such a different light as to undermine confidence in the verdict and
give rise to a reasonable probability of a different outcome. See Kyles, 514 U.S. at 434-35. This is
especially so when considering the cumulative impact of this evidence together with the suppressed
impeachment evidence against Langenbach. See id. at 436. In other words, we hold that because
of the State's suppression of impeachment evidence, Hall did not receive the fair punishment
trial that the Due Process Clause requires. We accordingly sustain Hall's seventh issue and, to this
extent, her sixth issue.


CONCLUSION

 We have overruled Hall's points of error challenging her convictions but sustained
her points to the extent they challenge her punishment. Accordingly, we affirm the district court's
judgments as to the findings of guilt, reverse those parts of the judgments imposing sentence, and
remand the causes for a new trial on punishment. See Tex. Code Crim. Proc. Ann. art. 44.29(b)
(West Supp. 2008).



 __________________________________________

 Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed in part; Reversed and Remanded in part

Filed: February 19, 2009

Publish
1. 373 U.S. 83 (1963).
2. The receipt itself stated only that the purchases had been made at "3:18" on August 17.
Jeffrey Breed, an owner of the store, confirmed that the store would have been open only at 3:18 p.m.
3. Both Sharon Cave and Loren Hall, Hall's father, testified at trial. We will use the first
names of the parents and their children when necessary to avoid confusion with their common
surnames. 
4. Pitonyak's cell phone records were in evidence. They reflect a four-minute call to a number
in Corpus Christi at 5:39 p.m., which corresponds roughly to the time frame Sharon described. The
records also show a two-minute call at 5:47 p.m. to a Corpus Christi number that corresponds to
Jennifer's cell phone number.
5. Pitonyak's phone records reflect an 8:30 p.m. call to a number in the Corpus Christi
area code.
6. Photographs of the body parts were also in evidence.
7. Hall's cell phone records reflected that Pitonyak sent her a text message at 3:34 a.m.
(which, according to Nora Sullivan's account, would have been shortly after Pitonyak left her condo)
and that Hall texted back at 3:35 a.m. There was testimony that Hall's return message stated, "What
do you mean." Pitonyak's cell phone records, in contrast, showed the earliest text message he sent
to Hall on August 17 was at 5:34 a.m. and did not reflect a responsive text message from Hall. 
Thereafter, both Hall and Pitonyak's cell phone records reflect a thirteen-minute call from Pitonyak
to Hall beginning at approximately 6:00 a.m., a one-minute call from Hall to Pitonyak beginning at
6:57 a.m., a four-minute call from Pitonyak to Hall beginning at approximately 6:57, and a two-minute call from Pitonyak to Hall beginning at about 7:24 a.m.
8. Carridine, however, suggested that any DNA from anyone who had merely touched the
saw could have been "overpowered" by Cave's blood.
9. Moreover, Sedwick testified that when he entered the condo on the following morning,
there was a strong odor coming from the bathroom. However, there was no testimony regarding
the extent to which this indicator would also have been present on the 17th.
10. There was also testimony that, much to Hall's consternation, Pitonyak had other female
friends that included Cave and Sullivan. Despite Hall's reservations, there was no direct testimony
that Pitonyak was romantically linked with either Cave or Sullivan at the time of the crime, although
there was evidence in the record indicating they had drug use in common.
11. Hall listed her screen name as "DocPhantasm" and her favorite quote as the following
statement from horror writer Peter Straub:


You're part music and part blood, part thinker and part killer. And if you can find
all of that within you and control it, then you deserve to be set apart.


Hall also listed, among her favorite films, several that had violent crime themes: Pulp Fiction,
Scarface, Carlito's Way, Heat, and Donnie Brasco. At least two of the films, the State pointed out,
had scenes involving the dismemberment of bodies.


 Elsewhere on the page, under "About Me," Hall commented, "Uh, don't be like me. Not
a role model! Also, I'm really quite bored. Entertain me?" Under "Clubs and Jobs," she similarly
opined that "I hate my job. Working is for losers." Under "Looking For," Hall indicated, "Whatever
I can get."
12. Ryan Martindill, on the other hand, recounted that during Hall's visit on August 24, she
claimed that "she was innocent," that "she did not know what was going on" at Pitonyak's condo,
and that she had denied ever entering the condo's bathroom.
13. It was on the following day that Hall professed to Martindill her innocence and ignorance
of Pitonyak's crime.
14. The record actually read, "Jennifer Cave (sic)." From context, the State obviously
intended to refer to Hall rather than Cave.
15. Actually, Sullivan didn't say this. It was Rosalez who used the term "mastermind," but
he denied that Hall ever claimed to have masterminded the evidence-tampering, as opposed to the
flight to Mexico. The facts asserted by the State most closely resemble Langenbach's testimony. 
16. See Merriam-Webster's Collegiate Dictionary 764 (10th ed. 2000) ("The crime of
unlawfully killing a person especially with malice aforethought."); American Heritage Dictionary
of the English Language 863 (1973) ("The unlawful killing of one human by another, especially with
premeditated malice."); Cambridge Dictionary of the English Language, available online at
http://dictionary.cambridge.org/define.asp?key=murder*1+0&dict=A (last visited January 6, 2009)
("The crime of intentionally killing a person."); Compact Oxford English Dictionary, available
online at http://www.askoxford.com/concise_oed/murder?view=uk (last visited January 6, 2009)
("The unlawful premeditated killing of one person by another.').
17. See Random House Dictionary of the English Language 1266 (2nd ed. 1987) ("The killing
of another human being under conditions specifically covered in law."); The American Heritage
College Dictionary 898 (3rd ed. 2000) ("To kill another human being unlawfully."); Webster's New
College Dictionary 721 (2nd ed. 1999) ("To kill unlawfully."); Bryan Garner, Garner's Modern
American Usage 533 (Oxford University Press 2003) ("The killing of another human being.");
Webster's Third New International Dictionary 1488 (1986) ("The crime of killing a person
under circumstances specifically defined by statute."); American Heritage Dictionary of the English
Language 863 (1973) ("To kill unlawfully."); Merriam-Webster's Collegiate Dictionary 764
(10th ed. 2000) ("To slaughter wantonly.").
18. Thus, we are not called upon to address "what remedies are available when the State's
conduct is of a less culpable nature." State v. LaRue, 152 S.W.3d 95, 100 (Tex. Crim. App. 2004). 
Likewise, Hall does not appear to contend on appeal that the district court abused its discretion in
failing to provide any remedy short of excluding Sullivan's testimony.
19. The district court stated, "You have a duty to disclose this immediately if it's an
admission.  Those are the rules. There's no doubt about that." The court ruled that Sullivan's
testimony is "not coming in right now this morning, I can guarantee you that."
20. When tendering the continuance motion to the district court, Hall's counsel requested that
the court "reserve ruling on it until you do the other."
21. Hall also alleged that the State knew or should have known that Sullivan had fabricated
her testimony about the admissions. Hall has not pressed this claim on appeal.
22. Responding to Hall's charge that the State knowingly presented false testimony,
the prosecutor averred that Sullivan had "appeared to be honest and truthful,"and that "I had no
indication that her statements were false or fabrications."
23. We observe that when the first-chair prosecutor later presented an affidavit in opposition
to Hall's new trial motion, he did not address the issue of Sullivan's statements.
24. We also observe that, even without the additional investigation Hall's counsel desired,
counsel was able to raise some inferences at trial regarding Sullivan's credibility and her motives
to fabricate her account of Hall's statements. Hall's counsel attempted to raise the inference that
Sullivan had recently fabricated a lie to implicate Hall out of anger or spite related to Pitonyak's
conviction and the Pitonyak jury's evident rejection of his theory that Hall, not he, had dismembered
Cave's body. Counsel highlighted the facts that Pitonyak had shown up at Sullivan's door at
3:00 a.m.; that she had not called police after seeing him armed, with blood on him, claiming to
have been in a gunfight; and that she had repeatedly visited Pitonyak in jail. He also questioned
Sullivan about testimony the jury had previously heard from Richard Barberia, one of the Austin
police officers who had investigated the crime scene. Barberia recounted that some residents of
the condominium complex had informed him that a woman, who later turned out to be Sullivan,
"was acting kind of weird." He located Sullivan and spoke with her. According to Barberia,
Sullivan asked "what had happened and who was the girl?" "That question concerned me," Barberia
explained, "for I did not remember telling her that a woman was involved." Sullivan had also
indicated to Barberia that Pitonyak was "a good friend of hers," that she had seen Pitonyak on
Tuesday, August 16, and that he had attempted to call her during the evening of Wednesday,
August 17 (when Pitonyak was preparing to flee or was fleeing to Mexico). Hall's counsel also
questioned Sullivan as to why she had never previously divulged Hall's alleged admissions, despite
having testified in Pitonyak's trial and been interviewed by counsel in that case. He also accused
Sullivan of being angry or "festering" over Pitonyak's conviction, which she denied. This line of
questioning, however, was ultimately limited by counsel's inability to impeach Sullivan with details
about her relationship with Pitonyak and her display of emotions regarding his verdict.
25. In addition to the State's constitutional obligations, the district court specifically ordered
the State to produce any Brady materials. In her sixth and seventh points of error, Hall does not
complain of any concurrent violations of this discovery order.
26. The court found that "[t]he prosecutors in the instant case did not review the files
concerning prosecution of Langenbach and did not have personal knowledge of the New Zealand
convictions."
27. Hall's counsel and Langenbach had the following exchange:


Q: What were you in jail for here in Travis County?


A: Securing a document that had something to do with real estate.


Q: The initial charge was securing the execution of a document by deception?


A: Yes.


Q: Deception means by lying or deceiving somebody?


A: Yes, sir.


. . . .


Q: So, similar to the charge that you had been in prison for in New Zealand, you
were deceiving somebody?


A: Yes, sir.


Q: And then you also had a rap for misappropriation of property by a fiduciary?


A: Yes, sir.


Q: That means you were in a fiduciary duty to someone, took their property?


A: Yes, sir.


Q: And you had another case of securing execution of a document by deception
separate from the other one; is that correct?


A: It was all in one case, yes, sir.


Q: Well, they were all in one case, but they were different counts, weren't they?


A: Yes, sir.


Q: And eventually--actually, you had a fourth case pending but it got dismissed,
right?


A: Yes, sir, I guess. Yeah, I guess.


Q: In each instance you stole something or swindled somebody, cheated
somebody into signing things for you; is that right?


A: Yes, sir.
28. See supra at 10-11.
29. See supra at 13-15.
30. The State has acknowledged that "a human body or biological evidence" necessarily refers
to Cave's body or "a subcomponent" of her body. See Tex. Penal Code Ann. §§ 37.09(c), (d)(1),
42.08(c)(1).
31. Nor was there any testimony--even from Langenbach-- that Hall had fired the shot into
Cave's severed head. Moreover, even if evidence could support an inference that Hall (perhaps
out of jealousy or other dark emotion) had been the one to fire the shot into Cave's head, this would
not necessarily support the further inference that Hall did so "with intent to impair its verity or
availability as evidence."
32. Conley also professed "surprise" that prosecutors had contacted him after his meeting with
police, that he "could not understand why defense counsel had not asked me about the photo lineup,"
and that he "surmised that it was because the prosecutors neglected to share this information."
Conley also stated, "I felt used and ashamed of my role in what I now believe was little more than
a lynch mob seeking to unfairly convict Laura Hall."
33. Incidentally, in addition to volunteering his alleged account of Hall's ride to police, then
volunteering his assistance to Hall in her new trial motion, Mr. Conley has similarly interjected
himself into the proceedings on appeal, filing a pro se amicus curiae brief in support of Hall (and "in
the public interest in support of the peace and dignity of the State of Texas"). Conley both vaguely
disparages Hall's appellate counsel regarding an apparently unrelated matter and accuses the State of
"gross prosecutorial misconduct" in attempting to prosecute Hall for evidence-tampering involving
a human body (he questions whether a human body can be a "thing" under section 37.09 of the
penal code). Conley further argues that the State acted "deceptively"or committed "perjury" in
securing an indictment against Hall for felony hindering apprehension because Pitonyak had not yet
been charged with murder when the pair fled Travis County. See Tex. Penal Code Ann. § 38.05 (a),
(c), (d). As previously explained, the jury acquitted Hall of this offense and convicted her of the
lesser-included offense of misdemeanor hindering apprehension, which did not require a finding that
Hall knew Pitonyak had been charged with murder. See id.
34. E.g., testimony of Martindill, Aziz, and Langenbach noting awareness from media reports
concerning Cave's death and dismemberment, that Pitonyak had been charged with murder, that Hall
had fled to Mexico with him, and that Hall had been charged with aiding him.